**Tracy NICHOLS, Plaintiff,**

v.

**Crispus C. NIX and Darrold Dressler, Defendants.**

**No. 4–90–CV–30316.**

United States District Court,
S.D. Iowa, C.D.

Jan. 11, 1993.

John C. Barrett, Barrett Law Offices, Des Moines, Iowa, for plaintiff.

William A. Hill, Asst. Atty. Gen., for defendants.

## MEMORANDUM OPINION AND ORDER

BENNETT, United States Magistrate Judge.

Plaintiff Tracy Allen Nichols is an inmate at the Iowa State Penitentiary at Fort Madison, Iowa ("ISP"). Nichols asserts that his First Amendment rights under the United States Constitution were violated by the Defendants, Crispus C. Nix and Darrold Dressler, the warden and the mailroom clerk at ISP, by denying him three publications from the Church of Jesus Christ Christian ("CJCC"). The publications were denied based upon administrative regulations providing that an inmate may be denied publications that are "likely to be disruptive or produce violence." Nichols challenges the constitutionality of the regulations, both facially and as applied, as well as ISP's total ban on receiving publications from CJCC regardless of their content.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Nichols filed this 42 U.S.C. § 1983 action pro se on June 12, 1990. He sought injunctive relief and compensatory and punitive damages. This case was initially referred to United States Magistrate Judge Longstaff[1] for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on March 5, 1991. On December 16, 1991, Judge Longstaff referred this case to the undersigned. On April 23, 1992, the parties, pursuant to 28 U.S.C. § 636(c), consented

---

**1.** The Honorable Ronald E. Longstaff became a United States District Court Judge on November 5, 1991.

to trial of this matter before an United States Magistrate Judge.

Experienced civil rights counsel was appointed to represent Nichols. The trial was held on July 7, 1992, at ISP. Nichols was present and represented by John C. Barrett. Dressler was present and represented by William A. Hill, Assistant Attorney General for the State of Iowa. This matter is now fully submitted.[2]

## II. FINDINGS OF FACT

### A. Regulations

Iowa Administrative Code r. 291-20.-6(4)(a) (1989) provides that an authorized reason for denying a publication to an inmate is that the publication "[i]s likely to be disruptive or produce violence."[3] Rule 20.6(4)(a) is identical to State of Iowa, Department of Corrections policy IN-V-80(4).

A publication review committee ("the Committee"), made up of three members appointed by the Director of the Iowa Department of Corrections, is authorized to determine whether a publication should be allowed into the correctional facility. *See* Iowa Administrative Code r. 291-20.6(2)-(3) (1989). At all times relevant to this litigation, the three members of the Committee were John Sissel, the Deputy Warden at the Iowa State Men's Reformatory in Anamosa, Iowa; Paul Hedgepath, the Deputy Warden at ISP in Fort Madison; and Linda Robertson, a librarian from Des Moines, Iowa. A list of publications which have been rejected by the Committee is maintained at ISP and is referred to as the denied publications list. An approved publications list is also maintained at ISP.[4] If a publication is rejected, an inmate has ten days following the Committee's decision to appeal to the Director of the Department of Corrections. *See* Iowa Administrative Code r. 291-20.6(7) (1989).[5]

### B. Facts Relating to the Parties

#### 1. Nichols

In early 1990, Nichols, an inmate at ISP, was shown three pamphlets from the CJCC by another inmate, Terry Bodewine. Inmate Bodewine resided in the cell next to Nichols in cellhouse 319. Bodewine loaned Nichols the three pamphlets from the CJCC and Nichols reviewed them for several days. Bodewine received these three pamphlets by mail from the CJCC while he was an inmate at ISP.[6] For reasons unex-

---

**2.** The issues raised in this litigation are strikingly similar to those decided by this court in *Lyon v. Grossheim*, 803 F.Supp. 1538 (S.D.Iowa 1992), which dealt with the denial of religious comic books to an ISP inmate on the ground that the religious publications were "anti-Catholic" and "blatant bigotry" and were, therefore, likely to be disruptive. In *Lyon*, this court upheld the facial constitutionality of the "likely to be disruptive or produce violence" standard but found an as applied constitutional violation because the denial of the religious comic books was not reasonably related to a legitimate penological interest.

**3.** Iowa Administrative Code r. 291-20.6(4)(a) (1989) provides that:

> **20.6(4)** A publication may be denied when the publication presents a danger to the security or order of an institution or is detrimental to the rehabilitation of an inmate. Authorized reasons for denying a publication are that the publication:
> a. Is likely to be disruptive or produce violence.

Iowa Administrative Code Ch. 291 was transferred to Chapter 201 in 1991.

**4.** Among the publications listed on the approved list are many publications relating to Malcolm X and the Black Muslims. These publications include *Malcolm X—By Any Means Necessary* (a collection of speeches by the Nation of Islam and Black Muslim leader Malcolm X); *Malcolm X on Afro American History; Malcolm X Talks to Young People; Malcolm X—The Last Speeches; Malcolm X—The Man & His Ideas;* and *Muhammad Speaks,* a Black Muslim newspaper.

**5.** Iowa Administrative Code r. 291-20.6(7) (1989) provides:

> An inmate may appeal the committee's decision or the denial of a publication for treatment reasons within 10 days of receipt of the decision by filing written objections to the Director, Department of Corrections, Capitol Annex Building, 523 East 12th Street, Des Moines, Iowa 50319. The director's decision shall be final.

**6.** The three publications shown to Nichols were *Who What Where When? Aryan Nations, America Needs the Divine Law* and *Correspondence Bible Course* by the American Institute of Theology.

plained in the record, Bodewine apparently had no difficulty obtaining these publications.

Nichols found the information contained in the publications interesting and wrote to the CJCC for copies. Nichols is not, nor has he ever been, a member or follower of the CJCC.[7] Nichols professes to not be the follower of any specific religious faith or sect. Rather, Nichols' interest in religion has led him to look into such varied religions as Catholicism, Islam, born-again christian, and Wicca. The CJCC is the latest religion Nichols has investigated. Nichols' exploration of these various religions has been motivated by a sincere spiritual quest or as he testified "soul searching."

### 2. The CJCC

The CJCC, which has been in existence since 1946, is based in Hayden Lake, Idaho. The current head of the CJCC is Dr. Richard G. Butler. Dr. Butler testified there are approximately 50,000 to 55,000 followers of the CJCC. The CJCC advocates separation of the races, and African–Americans are not permitted to be members of the church. If an inmate writes to the CJCC for information, the inmate will be provided with the first installment the *Correspondence Bible Course*, which teaches the tenets of the CJCC religion. The entire bible study course has been completed by 740 inmates, and approximately 2,000 to 3,000 others have taken part of the course. No known acts of violence have resulted from the CJCC's dissemination of this material to inmates. Dr. Butler, on behalf of the CJCC, has visited and conducted services in several prisons throughout the United States. There is no evidence in the record of acts of violence resulting from Dr. Butler's activities in prisons throughout the United States. Moreover, the record is also silent with regard to any security problems raised by the CJCC's dissemination of its publications to inmates.

### 3. The Rejection of the CJCC Publications

Nichols received a notice of rejection from the mailroom at ISP approximately eight to ten weeks after ordering the pamphlets from the CJCC. The rejection notice was signed by Defendant Dressler, the mail clerk at ISP. The rejection notice indicates that Nichols was denied the publications on March 28, 1990. The rejection notice indicated the reason for the rejection of the materials was that they had been disapproved by the Committee.[8] Defendant ISP Warden Crispus C. Nix had no

---

**7.** The court understands Nichols' First Amendment challenge to be based on the free speech rather than the free exercise clause of the First Amendment. Therefore, the weighty and difficult inquiry into whether the CJCC is a religion is unnecessary here. This inquiry only becomes necessary when a free exercise claim under the First Amendment is made. *See e.g., Murphy v. Missouri Dep't of Corrections,* 814 F.2d 1252, 1255–56 (8th Cir.1987) (appellants suffered no harm by the lack of a specific factual finding that CJCC was a religion); *McCabe v. Arave,* 827 F.2d 634, 637 n. 2 (9th Cir.1987) (The Ninth Circuit and the district court assumed without deciding that plaintiff's beliefs were sincerely held and that the CJCC qualified as a religion); *Wiggins v. Sargent,* 753 F.2d 663, 666–67 (8th Cir.1985) (the court remanded to district court for a reexamination of whether inmates' beliefs in CJCC were religious, entitling them to some free exercise clause protection). In *Murphy, McCabe* and *Wiggins* the inmates all raised free exercise claims.

It is well established that religious discussion and religious appeals to non-believers are constitutionally protected speech. *Widmar v. Vincent,* 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 274 n. 6, 70 L.Ed.2d 440 (1981); *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

**8.** The notice of rejection is an ISP form that, after identifying the inmate and the return address on the correspondence, lists nine standard reasons explaining why "mail has been determined to be undeliverable." Dressler checked the following reason: "G. Publication has been disapproved by Publications Review Committee." The court is unable to determine from the record whether Dressler checked this reason because of the total prohibition on receiving written materials from CJCC or because they had previously been excluded by the Publications Review Committee. In any event, review by the Committee of Nichols' request concerning the three CJCC publications did not take place until the latter part of June, 1990.

direct personal involvement in the denial of the three CJCC publications to Nichols.[9]

#### 4. The CJCC Publications

The three publications which were rejected by Dressler (on March 28, 1990) and the Committee (on June 27, 1990) are *America Needs the Divine Law, Who What Why When Where? Aryan Nations* and *Correspondence Bible Course. Who What Why When? Aryan Nations* is a two-page pamphlet published by the CJCC and contains a one-half page biography of the Aryan Nations. The remainder of the pamphlet relates the tenets of the CJCC: That Adam was the origin of the white race, and that the children of the Bible are the twelve tribes of Israel and their progeny. The pamphlet also asserts that Yahweh (God) created separate races and that each of these races has a specific place in Yahweh's hierarchical order, with whites or Aryans being at the top. It states that "the Canaanite Jew is the natural enemy of our Aryan (White) Race," that there is an ongoing battle between Jews and Aryans, and that Aryans must preserve their own race. The publication does not encourage, support or condone violence toward any racial, religious or ethnic groups. Indeed, the pamphlet does not advocate any specific action.

*America Needs the Divine Law* is a thirty-eight page pamphlet written by Dr. J. Franklin Snoek, with a one-page introduction by Pastor Sheldon Emry. The central theme is that the Bible provides national instructions or "Divine instructions." The Ten Commandments form the basis for this divine law; "[t]hey are the plan and formula for the government of the nation and the conduct of the citizens." *American Needs the Divine Law* at 7. The article begins by discussing the notion that statements in the Old Testament have been mistranslated. Specifically, it argues that the term "law"

as used in the King James version of the Bible is a mistranslation of a Hebrew term which means both law and ritual. The point being made by the publication is that the law described in Old Testament was not abolished by the teachings in the New Testament. Instead, only certain rituals described in the Old Testament were abolished by the New Testament.

The article then shifts to a discussion of what it terms "national problems." First, the article asserts that permitting slavery was one of three errors in the constitution. It states that legal barriers to "race mixing" have been struck down, and that this nation's leaders "are FORCING the mixing of the races. Race mixing is unnatural and is a violation of Divine law. It always results in crime and violence—not just in our time, but from the very beginning." *Id.* at 14. The publication then argues that the United States should negotiate with African nations in order to accomplish "the return of the Negroes to Africa." *Id.* It argues that the United States could direct foreign aid to those countries to aid them in the transition. The article then goes on to discuss at length usury and the banking industry in the United States, followed by critical discussions of taxes, monopolies, farming practices, criminal law, defense, health and foreign policy. It concludes by reenforcing the central theme of the publication, that if the divine law were followed in the United States, the county's woes would be eradicated. This publication does not encourage, support or condone acts of violence towards any racial, religious or ethnic groups.

The third publication which was rejected by the Committee is the fifty-seven page first installment of the American Institute of Theology Bible Study Course. It contains the first four lessons in the course.

---

9. The record does not reveal any personal involvement by Defendant Nix in prohibiting or restricting Nichols' access to the three CJCC publications. It is clear that Defendant Nix may not be held liable for the actions of Defendant Dressler under the doctrine of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978); *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir.1987) (citing *Cotton v. Hutto,* 577 F.2d 453, 455 (8th Cir.1978)). Furthermore, Nichols has offered no theory of supervisory liability against Defendant Nix. *See e.g., City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Therefore, Nichols' claims against Defendant Nix are dismissed.

The first lesson is composed of six chapters. The first chapter is entitled "The Bible; How it Came to Us." This chapter commences by emphasizing that the Bible is the word of God. It notes how the Bible has been translated from Hebrew to Greek, then from Greek to Latin, and finally from Latin to English. This chapter also emphasizes how the King James Version of the Bible contains mistranslations. The second chapter is entitled "Lost Foundations." The thrust of this chapter is that people have lost touch with the teachings of the Old Testament, and that the Old Testament's teachings form the basis for our society. The third chapter is "The Old Testament Canon." This chapter relates the history of the term canon, and its use in the Bible. The fourth chapter is "Ancient Versions of the Bible." As the name implies, this chapter relates the history and forms of Old Testament translations. The fifth chapter is entitled "New Testament Canon." This chapter relates the history of the New Testament and its various translations. The sixth chapter, and the last in the first lesson, is "The Bible as Covenants, New Testaments." This chapter discusses the origins of the title "the Bible," as well as the New and Old Testaments.

The second lesson contains five chapters. Among other themes, these chapters relate the stories of Adam and Eve, and of Cain and Abel. The theme of the final chapter of this lesson, "Man and Beast," is that each group of people has its own identifiable characteristics. In making this point, it claims the Japanese have "the Asiatic characteristics of treachery and senseless cruelty for its own sake." *The American Institute of Theology Bible Study Course* at 21.

The third lesson consists of four chapters. The varied themes of these chapters include the need to follow the divine law, an anti-evolution argument, and a critical reexamination of the Noah's ark story in the Bible. The fourth and final lesson is comprised of seven chapters. In this lesson, the biblical stories of Jacob and Joseph are reviewed, as well as five chapters of the Bible. Chapter 21 of the publication,

*Does God Command Racial Segregation?*, argues against miscegenation. This two-page chapter stresses the view that the Bible prohibits interracial marriages, and that non-whites may not be members of congregations. It points out various passages in the Bible to support this thesis, and also claims that mistranslations in the King James version of the Bible are partly responsible for people misinterpreting certain passages which forbid such conduct.

The *Correspondence Bible Course* does not encourage, support or condone acts of violence towards any racial, religious or ethnic groups. The *Correspondence Bible Course* does not advocate any specific action.

### 5. The Committee Vote

Following rejection of Nichols' administrative appeal, a divided Committee voted two to one to reject the three CJCC publications. The Committee did not have a meeting where all three members were present and a vote was taken. Rather, each member of the Committee signed the form indicating their vote and the reasons for the vote. The form was mailed from one Committee member to another until it was completed. On June 15, 1990, Hedgepath voted to deny the publications, stating that "[m]ost of the material is reasonable but page 55 is likely to produce disruption or violence, therefore taken as a whole the publication should be denied. Robertson, who voted to permit the three works on June 21, 1990, commented that "[t]aken as a whole, I can't think we should deny the publication because one page (55) "may" prove disruptive. The publication is offensive and racist, but I think it is unlikely to make one a racist who is not already a racist." Finally, on June 27, 1990, Sissel cast the deciding vote to deny Nichols the publications, noting that "[t]he tenants [sic] of this material is [sic] spelled out in the pamphlet who what when Aryan Nations uses the bible to justify racism [sic] superior race—potentially disruptive to a prison population."

Before voting to reject the three publications, Sissel reviewed at most 25 percent of

the material. He read *Who What Why When Where? Aryan Nations*, but did not read *America Needs Divine Law*. He read parts of the *Correspondence Bible Course*. Sissel speculated that the materials were likely to arouse feelings on the part of inmates which might cause problems at ISP. Sissel expressed concern about what he considered to be the white supremacy aspects of the publication, and how that might interfere with inmate integration at ISP. Sissel voted to deny the publication under Iowa Department of Corrections standard 4–A, "likely to be disrup-

tive or produce violence." [10] Sissel did not base his decision to reject these publications on any evidence that the publications had, in fact, led to disruptions in other prisons, or had caused a disruption at ISP.

As was the case with Sissel, Hedgepath had not read all of the materials. He based his decision to deny the three publications on what was contained on page fifty-five of the *Correspondence Bible Course*.[11] He concluded that that portion of the publication could possibly cause a problem at ISP since it argues against per-

---

**10.** *See supra* n. 3.

**11.** Page 55 of the *Correspondence Bible Course* states:

> YET THOSE WHO SEEK TO FORCE INTEGRATION in the schools and churches are now beginning to admit that their real purpose is to bring about RACIAL INTERMARRIAGE. They have even deceived certain well-meaning but ignorant clergymen into helping them. Even without intermarriage, JUST ALLOWING NON–WHITES INTO THE WHITE CHURCHES IS DISOBEDIENCE TO GOD. Do you say, "I didn't see *that* in my Bible?"
>
> That is only because a mistranslation conceals it from you. No doubt, you were puzzled when you read the following:
>
> *DEUTERONOMY 23:2* "A *bastard* shall not enter into the Congregation of the Lord: even to his tenth generation shall he not enter into the Congregation of the Lord." You wondered at this, because an illegitimate child is not to blame for the sins of its parents. Quite right! But the "bastard" spoken of here, does not mean, "a child born out of wedlock." The Hebrew word mis-translated "bastard" is the word "MAMZER": it means a MIXTURE, a HALF–BREED OR MONGREL. It has nothing to do with whether a child's parents were married, but it refers to THE FORBIDDEN INTERMIXTURE OF RACES. THAT IS WHY THE PENALTY EXTENDS FOR TEN GENERATIONS: and it shows how seriously God treats this sin. It is true that the mulatto child is not to blame for his parents' sins: BUT HE IS STILL A MULATTO. The first generation would be a half-breed; the second would have at least a quarter of the dark blood; the third at least $\frac{1}{8}$; the fourth, $\frac{1}{16}$; and so on. IN THE TENTH GENERATION, THE NEGRO BLOOD MAY BE AS SMALL AS ONE PART IN 1,024—YET GOD HIMSELF SAYS THAT THIS IS TOO MUCH TO BE ALLOWED TO "ENTER INTO THE CONGREGATION OF THE LORD."
>
> IT YOU ADMIT THAT YOUR CHURCH is part of "the Congregation of the Lord" (which, in this case, refers to a congregation of worship, not a civil congregation) then hadn't you better consider God's commandment against the admission to it, of racially mixed couples and their offspring.
>
> The unfortunate children of such marriages are not the guilty ones, of course: the sin is that of their parents. Yet the fact that they cannot help what they are does not change the permanent fact that THEY *ARE* WHAT THEY ARE. The experience of thousands of years has demonstrated that the dark races do not have what it takes to produce the White Man's high civilization: they have never had it in their own lands, and they only have it here because we, the White majority, make it so. The mixed breed is the same: it does not have in proper measure those qualities which God so carefully implanted in the White Race to carry out certain purposes which He has assigned to them. Recognition that God, Himself, made the races different does not imply hatred or contempt for any of them; *difference* has its purposes, which must be respected. We do not expect the family cat to sing like a canary, nor the canary to keep mice out of the kitchen; if we went quail hunting, we would not expect a horse to point quail for us, neither would we try to saddle and ride the best hunting dog in the world. All the family pets are equally loved, and neither is despised because he can't do what some other does; but each has his own purpose, and trying to mix them up or interbreed them can only harm them.
>
> We know that there are many people to whom these facts are new. There are also many who have learned the evil lesson that they can get more money or more political popularity by violating these laws of God than by obeying them. Some of you may not like to be reminded of these things. But remember, we did not write the Bible: God wrote it, through His prophets: and His commandments are always right. FOR OUR OWN GOOD, FOR THE VERY SURVIVAL OF OUR WHITE RACE UPON THE EARTH, AND THAT WE MAY FACE OUR GOD WITH A BETTER CONSCIENCE, WE HAD BETTER OBEY THESE LAWS OF HIS.

mitting non-whites to hold religious services with whites, and ISP has an all faith chapel. He was further concerned about the *Correspondence Bible Course* causing problems at ISP due to statements in it against miscegenation, and how that might lead to disturbances when interracial couples had visits at ISP.

The third, final and deciding vote by Committee member Sissel occurred more than two weeks after Nichols' complaint was filed in this court.[12] Mr. Sissel did confer from time to time with Mr. Hedgepath concerning their votes regarding publications subject to review by the Committee. While Mr. Sissel testified he was not sure whether he talked to Mr. Hedgepath after Mr. Hedgepath voted to deny Nichols the publications and before he voted, the court finds it is more likely than not that he did so. Sissel was sure, however, that he did not speak with Ms. Robertson because it was his practice not to discuss these matters with her. Sissel knew he was casting the deciding vote because he had the Committee form in front of him on which Hedgepath and Robertson had already voted.

### 6. ISP's Total Ban on CJCC Publications and Written Materials

Defendant Dressler testified and the court finds that ISP maintains a total ban on inmates receiving publications and printed materials from CJCC. Indeed, Mr. Dressler testified that any written material sent from CJCC to an inmate at ISP would be denied. There are no exceptions. If a Holy Bible or the Book of Mormon was sent by the CJCC to an inmate at ISP, these publications, too, would be denied. This was because the CJCC appeared on the denied publications list.

### III. CONCLUSIONS OF LAW (INCLUDING SOME ULTIMATE FINDINGS OF FACT)

#### A. Introduction

1. The Court's Role in Adjudicating Prisoner Constitutional Claims and the Proper Deference to be Given Prison Officials

■ Although inmates may forfeit many valued freedoms and liberties upon being incarcerated, they nonetheless do retain at least some of their constitutional rights during confinement. At a minimum, prisoners are to be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objects of incarceration. *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); *Timm v. Gunter*, 917 F.2d 1093, 1099 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991). Thus, "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner*, 482 U.S. at 84, 107 S.Ct. at 2259.

■ An equally important precept is that prisoners' constitutional rights may be significantly limited or substantially constrained in order to further legitimate objectives of the penal system. "Foremost among these objectives is internal security." *Gunter*, 917 F.2d at 1099 (citing *Hudson*, 468 U.S. at 524, 104 S.Ct. at 3199). Thus, when addressing an inmate's claim of alleged constitutional violations, federal courts "must consider whether the constrictions that prison administrators have placed on inmates' rights are justified by

---

12. Sissel's vote also occurred one week after the Assistant Attorney General then assigned to this litigation filed a motion in this court seeking an extension of time and stating, *inter alia*, "the undersigned received a copy of the Complaint and Initial Review Order [dated June 12, 1990] June 19, 1990, from the Iowa State Penitentiary." Finally, Sissel's vote was entered on the Committee's form one day after the Defendants in this litigation filed a request for a protective order stating "the Defendants have yet to decide whether the publication at issue would threaten the security of the institution. *See* Defendants' Exhibit B." Request for Protective Order, June 26, 1990. Exhibit "B" which was requested to be sealed by the Defendants is the form the Committee used to record their votes and reasons for granting or denying inmates the publications at issue. At that time, only two committee members had voted: Hedgepath voted to deny Nichols the materials on June 15, 1990, and Robertson voted to allow Nichols the materials on June 21, 1990.

legitimate institutional concerns." *Gunter,* 917 F.2d at 1099. Federal courts must give great deference to the judgment exercised by prison administrators in attempting to strike a balance between the demands of institutional security and the constitutional rights of prisoners.[13] As the Eighth Circuit pointed out in *Gunter:*

> Such a balancing act is an exceedingly complex task, and not one easily undertaken by the courts, whose expertise in the imperatives of institutional security is slight and in no way approaches that of the professional administrators charged with the awesome task of running our prisons.

*Id.* at 1099.

The deference that courts properly accord to prison officials is not subject to being minimized in the case at bar simply because Nichols' claim involves access to religious literature from the "outside" world. *See Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) (acknowledging the delicate balance between prison security and those on the "outside" seeking to enter the prison environment in person or through written correspondence). Many claims "to prison access undoubtedly are legitimate; yet prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Id.*

The deference owed to determinations of prison officials in the interest of security was recently reinforced by the United States Court of Appeals for the Eight Circuit in *Falls v. Nesbitt,* 966 F.2d 375 (8th Cir.1992). In *Nesbitt,* the court stated "[i]t

is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 379 (citing *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).

■ This wide-ranging deference to the determinations of prison administrators is not boundless. "It is equally certain that '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" *Abbott,* 490 U.S. at 407, 109 S.Ct. at 1878 (quoting *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259). In discharging their duties, federal courts must protect the constitutional rights of prison inmates in the face of a prison regulation or practice which offends a fundamental constitutional guarantee. *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969); *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259.

With these general principles in mind, the court will now address the appropriate standard to be applied to Nichols' facial and as applied First Amendment challenges.

### 2. The Appropriate Standard of Review—The "Reasonable Relationship" Test

■ This court's analysis of Nichols' First Amendment claims is governed by the

---

**13.** In *Turner,* the United States Supreme Court indicated that the deference to be accorded prison officials arrives in part from separation of powers principles:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner,* 482 U.S. at 84–85, 107 S.Ct. at 2259. *See also Iron Eyes v. Henry,* 907 F.2d 810, 812 (8th Cir.1990) ("[I]ssues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution....") (citations omitted); *Lopez v. Robinson,* 914 F.2d 486, 490 (4th Cir.1990) (The United States Supreme Court "has persistently reminded lower courts that considerations of separation of powers and institutional competence suggest the need for judicial restraint....").

Supreme Court's decisions in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). A prison rule or regulation which impinges upon an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.[14] In adopting the "reasonable relationship" test, Justice O'Connor observed "[o]ur task ... is to formulate a standard of review of prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85, 107 S.Ct. at 2259 (quoting *Martinez*, 416 U.S. at 406, 94 S.Ct. at 1808).

*Turner* opined the "reasonable relationship" test was necessary

> if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be

subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id.* at 89, 107 S.Ct. at 2261–62 (citations omitted).

The "reasonable relationship" test articulated in *Turner* was subsequently applied in *Abbott* to uphold the facial validity of the Federal Bureau of Prison regulations restricting inmate access to certain publications.[15] *Abbott*, 490 U.S. at 404, 109 S.Ct. at 1876–77. In so holding, the Court specifically limited its earlier decision in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). *Martinez* held that the decisions of prison officials concerning censorship of inmates' incoming and outgoing correspondence was subject to the "least restrictive means" test, *id.* at 404–14, 94 S.Ct. at 1807–12, a less deferential approach than the reasonable relationship test. *Abbott* limited application of the least restrictive means test to prison regulations governing outgoing correspondence only. *Abbott*, 490 U.S. at 413, 109 S.Ct. at 1881.[16]

**14.** The "reasonable relationship" test was crafted when reviewing constitutional challenges to two Missouri prison regulations. The court upheld the constitutionality of a Missouri Division of Corrections regulation that generally restricted correspondence between inmates at different institutions within the division's jurisdiction. *Turner*, 482 U.S. at 91–93, 107 S.Ct. at 2262–64. The second regulation prohibited inmates from marrying unless the prison superintendent had approved the marriage after finding there were compelling reasons for doing so. The court invalidated this regulation as unduly burdening the constitutional right to marry under *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *Id.* at 94–99, 107 S.Ct. at 2264–67.

**15.** In *Abbott*, the court was primarily concerned with regulations set forth at 28 C.F.R. §§ 540.70 and 540.71 (1988). "These generally permit an inmate to subscribe to, or to receive, a publication without prior approval, but authorize the warden to reject a publication in certain circumstances. The warden may reject it 'only if it

is determined detrimental to the security, good order, or discipline of the institution or it if might facilitate criminal behavior.'" *Abbott*, 490 U.S. at 404, 109 S.Ct. at 1876–77 (citing 28 C.F.R. § 540.71(b)) (footnote omitted).

**16.** This court understands *Abbott* to have overruled *Martinez* only so far as the "least restrictive alternative" is no longer applicable to incoming mail. *Abbott*, 490 U.S. at 413–14, 109 S.Ct. at 1881–82. *Abbott* stated that "we acknowledge today that the logic of our analysis in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence." *Id.* Thus, this court does not understand *Abbott* to have completely overruled *Martinez*. This limitation on the court's prior holding in *Martinez* substantially altered existing case law among the lower federal courts. Indeed, each of the ten circuits that considered this issue, either before or after *Turner v. Safley*, had concluded or assumed that *Martinez* supplied the controlling standard for contest based censorship of books, periodicals and newspa-

The Court applied the "reasonable relationship" test in *Abbott*, rather than the less deferential approach of *Martinez*, because of its concern:

> that language in *Martinez* might be too readily understood as establishing a standard of "strict" or "heightened" scrutiny, and that such a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons. Specifically, the Court declined to apply the *Martinez* standard in "prisoners' rights" cases because, as was noted in *Turner*, *Martinez* could be (and had been) read to require a strict "least restrictive alternative" analysis, without sufficient sensitivity to the

need for discretion in meeting legitimate prison needs. The Court expressed concern that "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand," and rejected the costs of a "least restrictive alternative" rule as too high.

*Abbott*, 490 U.S. at 409–11, 109 S.Ct. at 1879–80 (footnote and citations omitted).[17]

In articulating the "reasonable relationship" test, the Court in *Turner* canvassed its earlier "prisoners' rights" cases,[18] and "identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry." *Abbott*, 490 U.S. at 414, 109 S.Ct. at 1882. These four factors are:

pers mailed to prisoners. The decisions of ten circuits holding *Martinez* to be applicable in prison censorship cases are as follows: *Dooley v. Quick*, 598 F.Supp. 607, 612 (D.R.I.1984), *aff'd*, 787 F.2d 579 (1st Cir.1986); *Morgan v. LaVallee*, 526 F.2d 221, 224–25 (2d Cir.1975); *Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1976), *aff'd in relevant part*, 548 F.2d 503, 504 (4th Cir.1977); *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978); *Brooks v. Seiter*, 779 F.2d 1177 (6th Cir.1985); *Aikens v. Jenkins*, 534 F.2d 751 (7th Cir.1976); *Valiant–Bey v. Morris*, 829 F.2d 1441, 1444 (8th Cir.1987); *Murphy v. Missouri Dep't of Corrections*, 814 F.2d 1252 (8th Cir.1987) (prison mail policy that operated as a total ban on white supremacist material was overly restrictive under *Martinez*); *Pepperling v. Crist*, 678 F.2d 787 (9th Cir.1982); *Lawson v. Dugger*, 840 F.2d 781, 786 (11th Cir.1987), *vacated*, 490 U.S. 1078, 109 S.Ct. 2096, 104 L.Ed.2d 658 (1989); *Abbott v. Meese*, 824 F.2d 1166 (D.C.Cir.1987), *vacated sub nom. Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

**17.** *Abbott* was a six-three decision with Justices Stevens, Brennan and Marshall concurring in part and dissenting in part. Justice Stevens' opinion concurring in part and dissenting in part was particularly critical of the majority's opinion partially overruling *Martinez* by limiting its scope to outgoing mail and applying a reasonableness standard to incoming mail. Justice Stevens observed:

> This peculiar bifurcation of the constitutional standard governing communications between inmates and outsiders is unjustified.... The Court today abandons *Martinez's* fundamental premise. In my opinion its suggestion that three later opinions applying reasonable standards warrant this departure is disingenuous.

> . . . . .

> The *Turner* opinion cited and quoted from *Martinez* more than 20 times; not once did it

disapprove *Martinez's* holding, its standard, or its recognition of a special interest in protecting the First Amendment rights of those who are *not* prisoners. Notwithstanding, today the Court abandons the premise on which *Martinez* was grounded. This casual discarding of "'the secure foundation'" of considered precedent ill serves the orderly development of the law.

*Abbott*, 490 U.S. at 424–27, 109 S.Ct. at 1887–89. (citations omitted) (Stevens, J. concurring in part and dissenting in part).

**18.** The earlier "prisoners' rights" cases analyzed in *Turner* are *Martinez*, 416 U.S. at 396, 94 S.Ct. at 1800 (constitutional challenge to prison regulations relating to the censorship of prisoners' incoming and outgoing personal mail, and restricting access to prisoners by legal assistants and law students seeking to conduct attorney-client interviews); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (constitutional challenge to a prison regulation prohibiting face-to-face media interviews with individual inmates); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (constitutional challenge to prison regulations that prohibited meetings of a prisoners' labor union, inmate solicitation of other inmates to join the union, and bulk mailings concerning the union from outside sources); and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (constitutional challenge to a Bureau of Prisons' regulation restricting inmates' receipt of hardback books unless mailed directly from publisher, book clubs or bookstores). *Turner*, 482 U.S. at 84–90, 107 S.Ct. at 2259–62.

(1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62; *Abbott*, 490 U.S. at 414–418, 109 S.Ct. at 1882–84.[19]

The United States Supreme Court's holdings in *Turner* and *Abbott*, as well as subsequent decisions of the United States Court of Appeals for the Eighth Circuit, require that prison regulations which impinge upon an inmate's constitutional rights are valid if they are reasonably related to legitimate penological interests. It is in the context of this "reasonable relationship" test that Nichols' facial and as applied constitutional challenge to the restrictions on his receiving CJCC literature must be measured.

### B. Nichols' Facial Constitutional Challenges to the Restrictions On His Receiving CJCC Literature

■ Nichols' facial constitutional challenge seeks to invalidate, on First Amend-

ment grounds, the administrative regulations that a publication may be denied to inmates at ISP if it "is likely to be disruptive or produce violence."[20] In *Abbott*, the court upheld the facial validity of administrative regulations promulgated by the Federal Bureau of Prisons which authorize rejection of a publication "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Abbott*, 490 U.S. at 403, 109 S.Ct. at 1876. There is striking similarity between the Iowa regulations challenged here and the regulations upheld in *Abbott*.[21]

The court concludes that Nichols' facial constitutional challenge is foreclosed by *Abbott* and must therefore fail. In reaching this conclusion, the court has considered the four factors identified in *Turner* and *Abbott* in ascertaining whether the regulation at issue "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.

First, "[t]he legitimacy of the Government's purpose in promulgating these regulations," is beyond question. *Abbott*, 490 U.S. at 415, 109 S.Ct. at 1882. The Department of Corrections' policy and the admin-

---

**19.** Decisions of the United States Court of Appeals for the Eighth Circuit, subsequent to the Court's holdings in *Turner* and *Abbott*, have routinely applied these four factors and the "reasonably related to a legitimate penological interest" test to determine whether prison regulations impermissibly impinge on prisoners' constitutional rights. *See, e.g., Abdullah v. Gunter,* 949 F.2d 1032, 1035 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Griffin v. Lombardi,* 946 F.2d 604, 607 (8th Cir.1991) (inmate brought action against prison officials for refusing to deliver his original diploma and transcripts); *Goodwin v. Turner,* 908 F.2d 1395, 1399 (8th Cir.1990) (inmate sought habeas corpus relief after denial of his request that he be permitted to artificially inseminate his wife); *Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th Cir.1990) (Native American inmate sought relief against enforcement of rule requiring all prisoners to wear their hair above their collars); *Salaam v. Lockhart,* 905 F.2d 1168, 1170–71 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991) (inmate who changed his name after imprisonment challenged prison's "committed

name" policy); *Blankenship v. Gunter,* 898 F.2d 625, 627 (8th Cir.1990) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Smith v. Erickson,* 884 F.2d 1108, 1110 (8th Cir.1989) (inmate sought to have prison officials enjoined from enforcing prison-canteen-only-envelope policy, refusing to mail legal correspondence, and refusing to supply free postage and envelopes).

**20.** Iowa Administrative Code r. 201–20.6(4)(a) (1989). *See supra* n. 2.

**21.** There is one major distinction. The regulations in *Abbott* precluded a warden from rejecting a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." 28 C.F.R. § 540.71(b); *Abbott*, 490 U.S. at 405, 109 S.Ct. at 1877. The Iowa regulations at issue here provide Iowa prison officials much greater latitude in excluding religious, philosophical, political, social, sexual, unpopular, or repugnant publications. Iowa regulations simply state that "no publication will be denied solely on the basis of its appeal to a particular ethnic, racial, religious or political group." Iowa Administrative Code r. 291–20.6(1) (1989).

istrative regulation challenged are expressly aimed at protecting prison security, a purpose the United States Supreme Court has said is "central to all other correctional goals." *Abbott*, 490 U.S. at 415, 109 S.Ct. at 1882. Additionally, concerning the issue of neutrality, the regulations on their face further an important or substantial government interest—security—unrelated to the suppression of expression. *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811; *Abbott*, 490 U.S. at 415, 109 S.Ct. at 1882. Where prison administrators "draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner.*" *Abbott*, 490 U.S. at 415–16, 109 S.Ct. at 1882–83 (footnote omitted).

The second *Abbott–Turner* factor, whether there are alternative means of exercising the right which remain open to prison inmates, also passes muster here. The challenged regulations "permit a broad range of publications to be sent, received and read...." *Id.* at 418, 109 S.Ct. at 1884. Similarly, the third factor in the *Abbott–Turner* analysis, whether the impact the accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison, is satisfied in this case. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott*, 490 U.S. at 418, 109 S.Ct. at 1884. Here, the class of publications to be excluded is limited to those found "likely to be disruptive or produce violence." [22] Because the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," *Turner*, 482 U.S. at 92, 107 S.Ct. at 2263, application of third factor supports the constitutionality of the challenged regulations.

The fourth and final *Abbott–Turner* factor is the "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.; Abbott*, 490 U.S. at 418, 109 S.Ct. at 1884. In the case at bar there is no evidence which would suggest that the regulations Nichols challenges—as distinguished from correctional officers' individualized decisions to exclude specific works of literature—are on their face an "exaggerated response" to the institution's obvious interests in preserving its internal security, and protecting the safety of staff and inmates.[23] Therefore, applying the reasonable relationship test of *Turner* and *Abbott.* and the factors relevant to the reasonableness inquiry, this court upholds the facial validity of the regulations which authorize denying to an inmate a publication that is likely to be disruptive or produce violence.[24]

### C. Nichols' "As Applied" Constitutional Challenge

#### 1. Introduction

Nichols also challenges the regulations as applied. Before turning to Nichols' "as applied" constitutional challenge, the court again notes the deference owed to the judgment of prison administrators in their attempts to strike a balance between institutional security and the constitutional rights of inmates. This deference, however, is not without limits. Federal courts' "prefatory declaration that prisoners retain certain basic constitutional rights has meaning." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991). The substantial deference accorded prison officials does not relieve federal courts from their duty to "make sure after an independent review of the evidence that the regulation is not an exaggerated response to prison concerns." *Id.* (citing

---

**22.** Iowa Administrative Code 201–20.6(4)(a) (1989).

**23.** Following the U.S. Supreme Court's decision in *Abbott*, lower federal courts have frequently upheld security based prison regulations against First Amendment facial challenges. *See, e.g., Thomas v. United States Secretary of Defense*,

730 F.Supp. 362 (D.Kan.1990) (regulation authorizing officials to reject incoming mail that might be disruptive not facially violative of first amendment).

**24.** Iowa Administrative Code 201–20.6(4)(a) (1989).

*Abbott,* 490 U.S. at 416–18, 109 S.Ct. at 1883–84); *Turner,* 482 U.S. at 96–99, 107 S.Ct. at 2265–67. Furthermore, "[w]hile we may not invalidate a regulation because we can imagine a more refined one, constitutional rights should be accommodated." *Salaam,* 905 F.2d at 1171. Thus, federal courts must not uphold "prison regulations that are clearly broader in their scope or significantly more burdensome in effect than reasonable alternatives." *Id.*

Two observations concerning the role of the First Amendment in prisons are important. First, the inclination to silence expression in the context of prisons is an enduring tendency which history and experience teaches is pervasive and recurrent. Secondly, First Amendment guarantees taken for granted in the outside world assume greater significance in the context of prison life. These concerns are discussed more fully below.

"All government displays an enduring tendency to silence, or to facilitate silencing, those voices that it disapproves." *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 235, 107 S.Ct. 1722, 1730, 95 L.Ed.2d 209 (1987) (Scalia, J., dissenting). This tendency may be particularly pronounced in prison because of its authoritarian structure, insularity and isolation from both public scrutiny and the mainstream of civilian life. "Prisons are too often shielded from public view ..." *O'Lone v. Estate*

*of Shabazz,* 482 U.S. 342, 358, 107 S.Ct. 2400, 2409, 96 L.Ed.2d 282 (1987) (Brennan, J., dissenting). In prison, therefore, the danger is especially great that censors will attempt "to eliminate unflattering or unwelcome opinions," *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811, and "to apply their own personal prejudices and opinions...." *Id.* at 415, 94 S.Ct. at 1812. In *Martinez,* the Court explicitly acknowledged this danger, observing that "some prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress unwelcome criticism." *Id.*[25] In *Martinez,* prison censors made a futile attempt to rationalize their exclusion of letters which " 'criticizing policy, rules or officials,' " " 'belittling staff or our judicial system or anything connected with the Department of Corrections,' " or containing " 'disrespectful comments,' 'derogatory remarks,' " or statements that " 'unduly complain or magnify grievances.' " *Id.*

Case history is replete with examples of correctional officials banning publications which do not advocate criminal behavior or prison disruption, are not obscene, and do not instruct bomb-building, liquor-brewing, lock-picking, escape-planning or other clandestine activities which would be injurious to a prison's security and safety.[26] Instead, the censored materials have expressed the points of view of religious minorities, people of color and political third

**25.** In *Cleavinger v. Saxner,* 474 U.S. 193, 204, 106 S.Ct. 496, 502, 88 L.Ed.2d 507 (1985), which acknowledged a similar danger, the Court noting that prison discipline committee members are "under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee."

**26.** *Guajardo v. Estelle,* 580 F.2d 748, 760 (5th Cir.1978) (prison officials sought to ban material advocating "prisoner rights" such as The Penal Digest International, published by the Fortune Society); *Aikens v. Jenkins,* 534 F.2d 751, 754 (7th Cir.1976) (local prison policies were interpreted to exclude Dostoevski's *The Gambler,* Gibran's *The Prophet* and all publications of Bantam Books); *Jackson v. Godwin,* 400 F.2d 529, 530–31 (5th Cir.1968) (*Ebony, Sepia, Pittsburgh Courier* and *Amsterdam News* which are published primarily for black readers were banned; magazines were restricted to *U.S. News and World Report, Sports Illustrated, Reader's Digest, National Geographic, Outdoor Life, Saturday Evening Post* and *Pocket Crossword Puz-*

*zles* ); *Lawson v. Wainwright,* 641 F.Supp. 312, 316–17 (S.D.Fla.1986) (Hebrew Israelite publications including a dietary manual and historical accounts of lynching of blacks banned by prison officials); *McMurry v. Phelps,* 533 F.Supp. 742, 765 (W.D.La.1982), *overruled on other grounds by Thorne v. Jones,* 765 F.2d 1270 (5th Cir.1985) (censorship of *Life Magazine* not justified by government interest); *Aikens v. Lash,* 390 F.Supp. 663, 671 (N.D.Ind.1975), *aff'd sub nom. Aikens v. Jenkins,* 534 F.2d 751 (7th Cir.1976) (quotations of Chairman Mao Tse–Tung censored because it was written by a communist); *Laaman v. Hancock,* 351 F.Supp. 1265, 1269 (D.N.H.1972) (writings of Karl Marx and successors which draw on world history and economic theory as they relate to the socialist movement censored); *Fortune Society v. McGinnis,* 319 F.Supp. 901, 903 (S.D.N.Y.1970) (prisoners not allowed to receive the Fortune Society newsletter without justification by prison officials).

parties, or contained information and opinion negatively reflecting on authority figures or prison officials. In addition to its potential to sweep too broadly, prison censorship is occasionally absurd.[27]

An additional consideration to be taken into account in cases of prison censorship is the unique and special role the First Amendment assumes within the prison environment. The First Amendment's guarantees, often taken for granted in the free world, assume far greater significance in the total isolation of prison life. Both courts and commentators have recognized the First Amendment's unique contribution to prison life.

> The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections, supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment.

*Wolfish v. Levi,* 573 F.2d 118, 129 (2d Cir. 1978), *rev'd sum nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Justice Marshall expressed a similar concern in *Martinez:*

> When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded. If anything, the needs for identity and self-respect are more compelling in the dehumanizing prison environment.... It is the role of the First Amendment and this Court to protect those precious personal rights by

which we satisfy such basic yearnings of the human spirit.

*Martinez,* 416 U.S. at 428, 94 S.Ct. at 1818. (Marshall, J., concurring). In his dissent in *O'Lone,* Justice Brennan pointed out that:

> Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to affirm membership in a spiritual community, however, may extinguish an inmate's last source of hope for dignity and redemption.

*O'Lone,* 482 U.S. at 368, 107 S.Ct. at 2414 (footnote omitted).[28]

Mindful of the deference properly accorded to prison officials' determinations, and the special role the First Amendment plays in prison life, the court now addresses Nichols' as applied constitutional challenge.

2. Application of the "Reasonable Relationship" Test to Nichols "As Applied" Constitutional Challenge

■■■ The starting point for assessing Nichols' "as applied" First Amendment claim is the reasonable relationship test of *Turner* and *Abbott,* and the four *Abbott–Turner* factors which guide the court's reasonableness inquiry. Because the *Abbott–Turner* factors were developed in a case which presented only a facial constitutional challenge, they do not always lend themselves to an "as applied" analysis. Their usefulness is dependant upon the facts of a given case. Accordingly, the court will address those factors most applicable and helpful to its analysis. *See Skelton v. Pri-Cor, Inc.,* 963 F.2d 100, 103 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1682, 118 L.Ed.2d 398 (1992) (only factor considered by court in "as applied" reasonableness inquiry was whether alternative

---

**27.** One New York prison deemed all maps to present risks of escape and, pursuant to this edict, maps of the Moon and other planets were removed from the prison library. Amicus Curiae Brief of the Correctional Association of New York, at 13 n. 14, *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (No. 87-1344). In a Wisconsin prison, pursuant to a ban on material about making weapons, inmates were forbidden to receive an issue of the *Progressive* containing an article about the hydrogen bomb. *Id.*

**28.** Similar thoughts have also been expressed by commentators on the question. As one writer noted: "An inmate's conscience is no less inviolable than that of an unconfined citizen, and a violation could well work an even greater harm upon the inmate, whose means of spiritual recovery are limited by the prison environment." Comment, *Religious Rights of the Incarcerated,* 125 U.Pa.L.Rev. 812, 853–54 (1977).

means of exercising the right remained open to the inmate).

The first *Abbott–Turner* factor is whether the objective underlying the regulations is legitimate, and whether the regulations are rationally related to that objective. The court concludes that the regulations, as applied to the CJCC materials sought by Nichols, do not rationally advance a legitimate government interest.

ISP officials proffered "likely to be disruptive or produce violence" as the prison standard for denying Nichols the CJCC publications. Although, security is a valid penological interest, the court cannot conclude, on the record before it, that possession of these publications pose a threat to prison security. Instead, the court finds the officials' security concerns regarding the CJCC publications are both exaggerated, *see Iron Eyes v. Henry*, 907 F.2d 810, 820–21 (8th Cir.1990) (Heaney, J., dissenting), and speculative. *Whitney v. Brown*, 882 F.2d 1068, 1074–78 (6th Cir.1989).[29]

There is no evidence that Nichols has ever caused a security problem resulting from his possession of religious publica-

tions. Similarly, the record is also devoid of evidence of past inmate confrontations as a result of other inmates possessing or reading religious publications. The absence of a security problem cannot be credited to ISP officials effectively keeping CJCC religious publications out of the institution. To the contrary, Nichols first learned of the CJCC while at ISP from fellow inmate Terry Bodewine, who permitted him to view his copies of the three CJCC publications at issue in this case. Bodewine also told Nichols how to obtain his own copies by writing to the CJCC.

At the time Nichols viewed Bodewine's copies of these publications, they were on the denied publications list. There was no resulting security disruption.[30] Although it is not necessary for an actual prison disruption to occur before correctional officials' security concerns will be deemed reasonable, mere declarations and incantations that a practice might be harmful to prison order, in the absence of a rational and reasonably articulable basis, cannot justify government suppression of the three CJCC publications. "The fact remains ... that

**29.** Indeed, it is this same kind of unsubstantiated speculation by prison administrators that led a district court in 1971 to hold unconstitutional the Nebraska prisons' ban on inmates receiving the Black Muslim newspaper, *Muhammad Speaks*. There the court held:

> Only by speculation can it be said that his receiving of *Muhammad Speaks* would promote the attitudes which the prison administration understandably decries. No evidence goes to how other inmates would view the contents of the newspaper. Finally, the administration's thought that the newspaper would impede efforts to rehabilitate the plaintiff and would decrease his chances for future assimilation into the general prison population is subject to the same observations with respect to the claimed "anti-government" and "racist" orientation of the newspaper. I conclude, with deference to the administration's concern for order, security, and rehabilitation, that the state has not carried its burden of proving a factual basis for denying to the plaintiff *Muhammad Speaks* in order to promote a compelling state interest.

*Rowland v. Sigler*, 327 F.Supp. 821, 827 (D.Neb.), *aff'd sub nom. Rowland v. Jones*, 452 F.2d 1005 (8th Cir.1971).

**30.** The lack of disruptions or other adverse consequences arising from the CJCC publications at

ISP is not surprising. As was pointed out in one of the amicus curiae briefs in *Abbott*, the overbreadth of prison censorship has been demonstrated by the lack of impairment to legitimate penological interests when formerly censored publications have been given to inmates. *See* Amicus Curiae Brief of The Correctional Association of New York at 9 n. 19, *Abbott*, 490 U.S. 401, 109 S.Ct. 1874 (No. 87–1344) [hereinafter *Amicus Curiae*]. For example, as a result of the litigation in *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1024 (2d Cir.1985), inmates were permitted to receive a report on the conditions at Attica. No reports of adverse consequences followed dissemination of that report. *Amicus Curiae at 9 n. 19*. Similarly, during the litigation in *Jackson v. Ward*, 458 F.Supp. 546 (W.D.N.Y. 1978), prison officials abandoned their censorship claims as to 51 publications without adverse reaction. *Amicus Curiae* at 9 n. 20. It was likewise noted by respondents in *Abbott* that through that case's fifteen year litigation history petitioners "ha[d] been unable to cite a single incident in which a threat to security was linked to a publication received by a federal prisoner." Brief for Respondents at 10, *Abbott*, 490 U.S. 401, 109 S.Ct. 1874 (No. 87–1344). Respondents also observed that petitioner's sole outside corrections expert was unable to cite any adverse incident caused by an inmate's reading an article. *Id.*

prison officials do not set constitutional standards by fiat." *Whitney*, 882 F.2d at 1074. Committee member John Sissel, Deputy Warden at the Iowa Men's Reformatory in Anamosa, Iowa, specifically testified that to his knowledge there have never been any fights resulting from religious literature which has racial pride as one of its tenets. This testimony was reinforced by the testimony of CJCC leader, Dr. Richard G. Butler. Although the CJCC Bible study materials have been disseminated to between 2,000 and 3,000 inmates throughout the United States, Butler was aware of no acts of violence resulting from this distribution of CJCC materials. Neither Deputy Warden Sissel nor Deputy Warden Hedgepath testified to any acts of violence, disruption or the creation of any security concerns at other penal institutions where the CJCC bible study materials have been disseminated.

Furthermore, the theme of racial separatism can be found in several other publications already permitted into ISP.[31] One such publication already on the approved list is Malcolm X's *By Any Means Necessary*. Several similar themes exist in both this publication and the CJCC works at issue in this case. Both discuss and encourage separation of the races through the emigration of African–Americans to Africa. Malcolm X, *supra*, at 5–6; *America Needs the Divine Law* at 14. Both also have general themes advocating separation of the races. Malcolm X, *supra*, at 7 and 27; *Correspondence Bible Course* at 55. Each publication also is critical of interracial marriages. Malcolm X, *supra*, at 9; *Correspondence Bible Course* at 55; *America Needs the Divine Law* at 14. Finally, both publications contain forecasts of racial domination by the respective author's race. Malcolm X, *supra*, at 117; *Correspondence Bible Course* at 55. The exis-

tence of other publications within the ISP setting espousing similar racial separatist themes, without any resulting disruptions, is compelling evidence that the CJCC publications at issue here are not likely to be disruptive or produce violence. Indeed, the court in *Wiggins v. Sargent*, 753 F.2d 663, 667 n. 6 (8th Cir.1985), in discussing the views of the CJCC, noted that other groups such as the Black Muslims express similar racial separatist views and the courts have provided these views First Amendment protection within the prison walls.[32]

Also, there are no institutional rules preventing ISP inmates from discussing the very topics that are the subject of the CJCC publications. Also, there is no evidence in the record that inmates discussing the topics of racial separatism or racial supremacy have led to violence, security or other problems at ISP. Indeed, Mr. Sissel testified that there were no institutional rules preventing inmates from discussing the very topics which are the subject of the CJCC publications.

Furthermore, the evidence indicates that no effort is made to suppress or censor newspaper articles, television, or other media which address issues relating to racial supremacy or superiority. The record is devoid of any evidence of a security problem in an Iowa correctional facility as a result of media discussions of these issues.

The absence of disruption, violence or a security problem, standing alone, while compelling evidence, does not conclusively establish the unreasonableness of the regulations as they were applied. *Turner* clearly requires the examination of additional factors in evaluating an as applied constitutional challenge. Nonetheless, under the first *Abbott–Turner* factor, there is no evidence connecting the regulation, as it

---

**31.** *See infra* n. 4.

**32.** The court in *Wiggins* stated:
[w]e observe that there are other belief systems which espouse racial separation or superiority. For example, the Black Muslims appear to hold such views and their religion has been accorded at least some first amendment protection by the courts. *See, e.g., Otey v. Best*, 680 F.2d 1231, 1233–34 n. 3 (8th Cir.

1982); *Rogers v. Scurr*, 676 F.2d 1211, 1212 (8th Cir.1982); *Rowland v. Jones*, 452 F.2d 1005, 1006 (8th Cir.1971) (per curiam) (upholding prisoner's access to "Muhammad Speaks," a publication containing statements derogatory of the white race); *Long v. Parker*, 390 F.2d 816, 822 (3d Cir.1968) (same).
*Wiggins*, 753 F.2d at n. 6.

was applied, to a legitimate security concern. Instead, the prison officials' actions were an exaggerated response to a perceived security risk.

Turning to the second *Abbott–Turner* factor, it appears Nichols had no alternative means of obtaining the restricted reading material. *See Jackson v. Elrod*, 881 F.2d 441, 445 (7th Cir.1989) (determinative factor was that the inmate had no alternate source for literature addressing his alcohol problem). The CJCC publications each present a unique interpretation of the Bible. Because the publications have been denied based on the subjective opinions of prison officials, specifically disapproval of the white separatist views of the CJCC, publications presenting similar views are also likely to be denied to Nichols.

The third *Abbott–Turner* factor requires the court to address "the impact accommodation of the asserted constitutional right will have on guards and other inmates. . . ." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott*, 490 U.S. at 418, 109 S.Ct. at 1884. As discussed above, the CJCC publications at issue here are not potentially threatening to prison security. Therefore, there need not be any concern about a "ripple effect" from permitting inmates to possess the publications. There is no apparent reason why allowing Nichols to possess the restricted material would cause violence. The publications do not advocate interracial violence or violence of any type. Furthermore, if rights "could be sacrificed in fear of those who would cause trouble under any regime, officials could ignore any individual right." *Salaam*, 905 F.2d at 1175.

Finally, under the fourth *Abbott–Turner* factor, the court is required to explore whether obvious, easy alternatives to the restriction exist. "[T]he existence of [such] alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. The most obvious alternative would be to restrict the CJCC material to the inmate's cell. A second alternative would be to designate a specific room, such as a library, to

house and catalogue the CJCC publications so their dissemination could be controlled. The court is not suggesting either alternative is necessary, particularly in light of its finding that the restricted publications are not detrimental to prison security.

The court also finds that the prison officials acted unreasonably and arbitrarily when denying Nichols the CJCC publications. Neither Sissel nor Hedgepath read the three CJCC publications in their entirety and neither cited a single reason why Nichols should be denied *America Needs the Divine Law*, a publication which Sissel had not even bothered to read before voting to deny the publication to Nichols. Moreover, the court finds that the ISP total ban on CJCC publications—without regard to their content—is unconstitutional. Even Deputy Warden Hedgepath conceded that a total prohibition on inmates receiving publications and other written materials from the CJCC "would probably be" or "could be" unreasonable.

The court has conducted a thorough independent review of the denied CJCC publications. The court specifically finds that the CJCC religious literature at issue here is similar to the literature advocating racial purity held constitutionally protected in *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir.1987). In that case, the court of appeals noted that:

> Given the strength of First Amendment protection for freedom of belief prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism.

*Id.* at 638 (citations omitted). The court went on to strike down a prison regulation which prohibited inmates from maintaining non-violent CJCC literature in the prison chapel, holding

> that literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the

prison, cannot be constitutionally banned as rationally related to rehabilitation.

*Id.* at 638.[33]

In a similar vein, the Eighth Circuit held in *Murphy v. Missouri Dep't of Corrections,* 814 F.2d 1252 (8th Cir.1987), that

A total ban on Aryan Nations materials is more restrictive of prisoner first amendment rights than is necessary to maintain prison security. Restriction of inmate access to Aryan Nations materials through the mail must be limited to those materials which advocate violence or are so racially inflammatory as to be reasonably likely to cause violence at the prison.

*Id.* at 1257; *see also Wiggins,* 753 F.2d at 668. Here, all three CJCC publications were banned, even though prison officials had not read all three publications. Indeed, ISP maintains a total ban on all CJCC publications. This total ban of all CJCC publications contravenes the holding in *Murphy* of a total ban on Aryan Nations literature. *Murphy,* 814 F.2d at 1257.[34] Under *Murphy,* a ban on publications "must be limited to those materials that

advocate violence or that are so racially inflammatory as to be reasonably likely to cause violence at the prison." *Id.* The CJCC publications at issue here do not advocate violence. The court finds that the CJCC publications at issue here neither advocate violence nor are so racially inflammatory as to be reasonably likely to cause violence at ISP.

The court therefore concludes that to find the three CJCC publications at issue here would likely lead to disruption in the prison would be, "on this record, the piling of conjecture upon conjecture." *Reed v. Faulkner,* 842 F.2d 960, 963 (7th Cir. 1988).[35] In *Williams v. Lane,* 851 F.2d 867, 886 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989), the United States Court of Appeals for the Seventh Circuit, in affirming the district court's findings of substantial constitutional violations observed:

Courts must of course recognize their limited competence in the troubled and complicated area of prison administration. However, prison administrators alleged to have violated inmates' rights

---

**33.** The district court found that inmates' right to distribute CJCC literature was not infringed since inmates were allowed to receive CJCC literature, and share the literature with other inmates. *McCabe v. Arave,* 626 F.Supp. 1199, 1207 (D.Idaho 1986). This aspect of the district court's opinion was not appealed.

**34.** This court notes that *Murphy* was decided using the standard articulated in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). *Murphy,* 814 F.2d at 1256. This court does not believe the result in *Murphy* would be altered by application of the *Abbott–Turner* analysis.

**35.** In *Reed,* the United States Court of Appeals for the Seventh Circuit vacated and remanded the district court's entry of judgment for prison officials. The issue in *Reed* involved the enforcement of a prison regulation prohibiting male inmates from wearing hair that touched their collar. Reed alleged that this regulation infringed his religious liberty to wear shoulder-length "dreadlocks" as a Rastafarian. The court in rejecting the prison officials' conjecture regarding the likelihood of racial violence held:

Whatever the ultimate merits of Reed's challenge, which may well be slight, the district judge's findings raise two serious problems. One concerns the finding about the danger of

racial conflict posed by the Rastafarian belief that blacks are superior to whites. No evidence of such a danger was presented, and in any event it is not easy to see how forcing Rastafarians to cut their hair is going to change this belief. One prison administrator testified "that a person who is wearing the symbol of the dreadlock might indeed be wearing something as a symbol" that blacks are superior to whites, and apparently it was this testimony that became transmogrified in the district court's opinion into "a security concern for potential racial conflict from the professed Rastafarian belief that dreadlock symbolizes black superiority." Actually there was no evidence that the dreadlock symbolizes black superiority, as distinct from being a conspicuous outward manifestation of Rastafarianism, a faith that does teach black superiority; however, as such a manifestation it might remind white inmates of the Rastafarian belief in black superiority. Yet this is pure conjecture, and to suppose that the wearing of dreadlocks would lead to racial violence is, on this record, the piling of conjecture upon conjecture.

*Reed,* 842 F.2d at 963. This is precisely the type of pure speculation and conjecture that forms the sole basis for the suppression of the religious literature sought to be obtained by Nichols here.

must meet such challenges with edifying and illuminating rejoinders drawn from their unique expertise, not with the modest responses advanced in this litigation. *Lane*, 851 F.2d at 886 (Flaum, J., concurring). Here, Nichols' constitutional challenge was hardly met with "edifying and illuminating rejoinders." Instead, the prison officials relied solely on subjective conjecture and speculative concerns totally lacking a factual basis in this record upon which to base their conclusion that the three CJCC publications would constitute a viable threat to either safety or security at ISP.

The court therefore concludes that either under the four *Abbott–Turner* factors which channel the reasonableness inquiry— or under the reasonable relationship test itself, that the regulation at issue, as applied, is not reasonably related to a legitimate penological interest. Allowing Nichols to receive the three CJCC publications at issue in this litigation would not be disruptive or produce violence. Moreover, neither the denial of the three CJCC publications at issue nor ISP's total ban on inmates receiving CJCC publications is reasonably related to a legitimate penological interest. The ISP ban on inmates receiving CJCC publications is an exaggerated response based upon speculation of prison officials unsupported by a reasonable basis. As such, application of these regulations to the three CJCC publications at issue violates Nichols' constitutional rights under the First Amendment of the United States Constitution.[36]

### D. Relief

#### 1. Introduction

Nichols' *pro se* complaint seeks equitable relief, $100.00 per day compensatory damages for each day he did not receive the

CJCC materials at issue, and $10,000.00 in punitive damages. "In Section 1983 cases, prisoners may receive remedies comparable to all civil litigants." *Lane*, 851 F.2d 867, 885 (7th Cir.1988).

#### 2. Equitable Relief

■ In shaping equitable relief, "the trial court is vested with broad discretionary power.... Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (footnote omitted). Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this court "has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Steffel v. Thompson*, 415 U.S. 452, 468, 94 S.Ct. 1209, 1220, 39 L.Ed.2d 505 (1974). For the reasons set forth above, this court has determined that Nichols' First Amendment rights have been violated by Dressler's denial to Nichols of the three CJCC religious publications. Accordingly, Nichols is entitled to a declaratory judgment that Dressler has violated his First Amendment rights.

The principles governing injunctive relief are well established. "A federal court possesses broad powers to remedy constitutional violations, but these powers are not boundless." *Al–Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir.1991). A federal court may exercise its remedial power "only on the basis of a constitutional violation." *Swann v. Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *accord Johnson v. Boreani*, 946 F.2d 67, 72 (8th Cir.1991). The petitioner must prove that the violation is on-

---

**36.** The court does not understand the Eighth Circuit's decision in *Fallon v. Lockhart*, 919 F.2d 1304 (8th Cir.1990), to be controlling here. The *Fallon* decision is a two to one per curium decision in which the panel affirmed dismissal, as frivolous, an inmate's complaint in which he alleged that his First and Fourteenth Amendment rights were violated when prison officials withheld CJCC materials mailed to him. *Id.* at 1305. The opinion does not identify the title or

subject of the publications withheld. Additionally, the opinion does not identify whether the inmates' claims were brought under the free exercise or free speech clause of the First Amendment. Also, the decision does not reveal the rationale of the district court's decision. Finally, the opinion makes no reference to the Eighth Circuit's prior decisions in *Wiggins* or *Murphy*.

going in nature or likely to recur. *See Green v. Mansour,* 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985); *Johnson,* 946 F.2d at 72. If the petitioner successfully establishes such a violation, the "nature and extent of the constitutional violation determines the remedy." *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (citing *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276). Finally, "[w]hile the remedy must be narrowly tailored," the court retains discretion to construct its remedial decree. *United States v. Paradise,* 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987). With these principles in mind, the court determines that Nichols is entitled to appropriate injunctive relief to remedy the ongoing constitutional violation regarding the three CJCC religious publications at issue. The denial of the religious publications constitutes ongoing irreparable injury to Nichols. "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989). Defendant Dressler is hereby enjoined from denying Nichols the three CJCC publications. It must be stressed that this order does not bar or limit Dressler or other ISP personnel from restricting or prohibiting Nichols or other ISP inmates from receiving other CJCC literature which advocates violence or which would present a danger to the security or order of ISP. This narrowly tailored injunction avoids the caveat that the entry of unnecessary or overbroad injunctions would " 'leave too little discretion in the hands of prison officials who must deal with the very difficult issues of security within their institutions.' " *Johnson v. Boreani,* 946 F.2d 67, 72 (8th Cir.1991) (quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)).

### 3. Damages

▮▮▮ Nichols also claims both compensatory and punitive damages. "In a section 1983 action, both compensatory and punitive damages are available upon proper proof." *Cunningham v. City of Overland,* 804 F.2d 1066, 1069 (1986). The United States Supreme Court has repeatedly observed that 42 U.S.C. § 1983 was intended to create " " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges or immunities secured' to them by the Constitution." " *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1046–47, 55 L.Ed.2d 252 (1978), (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988–89, 47 L.Ed.2d 128 (1976))); *see also Smith v. Wade,* 461 U.S. 30, 34, 103 S.Ct. 1625, 1628–29, 75 L.Ed.2d 632 (1983); *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981). Thus, when a § 1983 plaintiff "seeks damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura,* 477 U.S. at 306, 106 S.Ct. at 2542. "Generally, compensatory damages should attempt to place the plaintiff in a position similar to the one she or he would have been in had the violation not occurred." *City of Overland,* 804 F.2d at 1069. Unlike compensatory damages, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura,* 477 U.S. at 306 n. 9, 106 S.Ct. at 2542 n. 9.

The court determines that Nichols is not entitled to either compensatory or punitive damages. At the trial, Nichols testified the only relief he is now seeking is access to the CJCC religious materials. He specifically testified that he did not want any monetary relief. On the advice of another inmate, Nichols only sought monetary relief in his *pro se* complaint so, in the event he was transferred, this litigation would not become moot. Under these circumstances, the court determines that Nichols has waived any entitlement to monetary damages.[37]

**37.** There are two additional reasons for denying Nichols compensatory and punitive damages.

#### 4. Attorney Fees

Nichols is a prevailing party within the meaning of the Civil Rights Attorney Fees Award Act of 1976, 42 U.S.C. § 1988. *See generally, Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) ("They prevailed on a significant issue in the litigation and have obtained some of the relief they sought and are thus 'prevailing parties' within the meaning of § 1988."); *Farrar v. Hobby*, — U.S. —, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.... In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.").

Indeed, it is clear that statutory attorney fees awarded under 42 U.S.C. § 1988 are part of the "arsenal of remedies to combat violations of civil rights." *Evans v. Jeff D*, 475 U.S. 717, 732, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986). Pursuant to Local Rule of Court 22(a), Nichols shall have thirty (30) days to file his motion for reasonable attorney fees and costs.

#### IV. CONCLUSION

The Iowa Administrative Code r. 291–20.6(4)(a) and State of Iowa, Department of Corrections policy IN–V–80(4) which allow the censoring of publications likely to be disruptive or produce violence at ISP on their face do not violate the First Amendment of the United States Constitution.

First, the complaint does not specify whether Dressler is being sued in his official capacity or individual capacity. The United States Court of Appeals for the Eighth Circuit has indicated that a party wishing to sue an individual in both their individual and personal capacity should so specify in their pleadings. *See Nix v. Norman*, 879 F.2d 429, 431 (8th Cir.1989). Since the pleadings in this case refer to Dressler in his position as the mail clerk, a presumption is created that Dressler is being sued in his official capacity only. *See Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir.1985). The court, therefore, finds that Nichols has brought suit against Dressler in his official capacity only. The significance of this is that the Elev-

They are reasonably related to the legitimate penological interest of institutional security.

The court concludes, however, that Nichols' rights under the First Amendment of the United States Constitution were violated by the denial of the three CJCC publications at issue here. This denial was unsupported by a legitimate penological interest. The record evidence fails to support the rationale used to explain why the publications would likely be disruptive. Only pure conjecture supports the suppression of the three CJCC publications. Prison officials must ordinarily be afforded wide-ranging deference in promulgating and implementing restrictions on inmates. The court should yield to these official determinations regarding the necessity and propriety of such limitations.

However, this is one of those rare cases where deference to prison officials must yield to constitutional mandate. Deferring to prison officials on this record of pure conjecture would allow the incantation of the word "security" to insulate governmental suppression of religious reading material which government officials find potentially offensive. This would effectively turn prison officials into thought police with authority to suppress any and all written expressions which they find subjectively offensive or politically incorrect. Such unbridled deference would grant prison officials an unrestrained veto over the First Amendment. This, the United States Constitution does not permit.

enth Amendment prohibits the imposition of monetary damages against the state. Therefore, Nichols' claim for monetary damages in this suit is barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Norman*, 879 F.2d at 432.

Alternatively, even were the court to assume that Nichols had sued Dressler in his individual capacity, the record evidence fails to establish that Nichols has suffered actual damages as a result of Dressler's actions here. Damages may not be presumed for a constitutional violation. *See Stachura*, 477 U.S. at 309–10, 106 S.Ct. at 2544 (1986).

## V. ORDER FOR JUDGMENT

For the reasons set forth above, the court concludes that Nichols is entitled to a declaratory judgment, appropriate injunctive relief and reasonable attorney fees. Defendant Dressler is hereby enjoined from denying Nichols the three CJCC publications at issue in this case. Nichols' complaint against Defendant Nix is dismissed. It is ordered that judgment be entered accordingly.

IT IS SO ORDERED.