Wayne R. HAFF, Plaintiff,

v.

Marianne A. COOKE, Captain S. Haferman, Jeff Jaeger, and Scott Galligan, Defendants.

Civ. A. No. 94–C–0332.

United States District Court, E.D. Wisconsin.

April 12, 1996.

1106

David P. Honan, Soffa & Devitt, Whitewater, WI, for Plaintiff.

David E. Hoel, Assistant Attorney General, Madison, WI, for defendants.

### DECISION AND ORDER

REYNOLDS, District Judge.

### INTRODUCTION

Lawyers are supposed to winnow and sift. When faced with a mass of facts, the attorney must locate the critical facts, develop the best claims or defenses, and then argue the theory to the judge or jury. Instead of the winnow and sift approach, both sides in this case have adopted the kitchen sink approach: no fact is too minute and no legal theory is too tenuous for submission to the court. At the same time, the parties have often ignored the legal background in which they argue their claims.[1]

As a result of the litigation strategies, the court has a summary judgment record that stands almost six inches high (excluding the exhibits of seized documents) with little organization. In reality, the case is quite simple. In December 1993, guards at the Kettle Moraine Correction Institution ("KMCI") seized Haff's Aryan Nation material. Captain Haferman reviewed the material and investigated Haff's activity, suspecting that Haff was recruiting for a white supremacist gang. The following March, Haff contacted a lawyer to help him get his seized materials returned. That day, Haff was placed in temporary lockup. Haferman issued a conduct report, and Haff was found guilty after a hearing. Haff lost good time credit and was placed in segregation. Mr. Haff alleges that Captain Haferman retaliated against him either for his Aryan Nation beliefs or for his decision to call a lawyer.

Rather than rest on this allegation, Haff argues that almost every action KMCI officials took between December 1993 and April 1994 violated the Constitution, claims which mostly clutter the case. Haff's claim that the seizure of his Aryan Nation materials violates the Religious Freedom Restitution Act ("RFRA") and the First Amendment, his claim that he was denied due process in his disciplinary hearing, his claim that being placed in temporary lockup violated due process, his claim that he was denied access to his counsel, and his claim that failing to receive notice of undelivered mail violated due process, all fail to survive summary judgment.

The court grants summary judgment on all claims except the retaliation claim. Further, the court grants defendant Haferman thirty days to file a motion and brief for summary judgment on the retaliation claim.

Although a court must tolerate acrimony between the parties, the parties do not have a license to monopolize the court's time or resources. At some point, the parties' exces-

---

1. For example, despite the importance of retaliation, neither party explains the retaliation analysis. At the same time, the parties bicker over irrelevant facts. In its proposed findings of fact, the defendants say that Captain Haferman associates the swastika with the Nazis. The plaintiff challenges the fact because Haferman is not an expert in German history.

sive filings close the courthouse to other litigants who have legitimate disputes.

## FACTS

While Haff's story begins and ends with the Columbia Correctional Institution ("CCI") (a maximum security prison), it takes place primarily in the KMCI and includes a digression into the relatively obscure religion known as Identity Christianity. For this decision, the court will assume, without deciding, that Identity Christianity is a religion.[2] Haff was a prisoner in the Columbia Correctional Institution, serving a sentence for First Degree Sexual Assault. There, he practiced his religion: Church of Jesus Christ Christian, Aryan Nation ("CJCC"). Haff asserts that the Aryan Nation, like other Identity Christian groups, believes that the pre-Christian Angles, Saxons, Celts and Teutonic tribes were the descendants of the ten lost tribes of Israel. Based on that principle, Identity Christians believe that whites, as the descendants of the lost tribes, must remain racially pure. Some sects also espouse anti-black and anti-Semitic hatred.

In 1991, CCI officials seized some of Haff's materials, fearing that they were a threat to security. Later the warden allowed Haff to have his materials. (Haff Supp.Aff. ¶ 12.) On November 12, 1993, the Department of Corrections ("D.O.C.") transferred Haff to KMCI, a medium security facility. At the check-in, guards examined all the material that would eventually be confiscated; however, no one seized any of the material. (*Id.* ¶¶ 15–17.)

After Haff found out that Duane Hutter and Steven Isbel, two of Haff's dorm mates, were also Identity Christians, (*Id.* ¶ 22), the three decided to form an Identity Christian group. (Haff. Reply Aff.Ex. 1.) Haff began researching the procedures for obtaining approval for an Identity Christian group. Hutter, Isbel, and Haff met regularly to discuss their application. (Haff Supp. Aff. ¶ 2(b); Haff Reply Aff. ¶ 2(b).) The three never

practiced their religion during these meetings or at any other group meeting. At no time did Haff try to recruit other inmates into his religion or into a prison gang. None of the meetings affected prison security or caused any disturbances among the participants or between the participants and either prison officials or other inmates. (Haff Supp.Aff. ¶ 32.)

Haff's troubles began on December 8, 1993, when incident 083378 occurred. Several inmates told Officer Galligan that Haff was recruiting people for the Aryan Brotherhood (a gang unrelated to the Aryan Nation). Because Galligan believed that Haff may have been engaged in unauthorized group or gang activity, he filed a conduct report. (Galligan Aff. ¶ 9.) Despite acting on the inmates' information, Galligan's report omitted the names of the inmates who told him about Haff's recruitment. (Defs.' Answer to Interrog. 5.) Galligan did report that Haff used a red, three-ring binder in trying to recruit the inmates. (Haferman Aff.Ex. C.)

As a result of Galligan's report, Officer Immel searched Haff's cell and possessions. Immel found four pamphlets, two letters, and three papers with the SS insignia. Immel also found a 3–ring binder entitled "Heraldry of the Aryan Nations Standards." Immel seized the material and, without examining it himself, gave it to Captain Haferman for review. (Haferman Aff.Ex. D.) Haferman decided to investigate whether Haff was violating prison rules. (*Id.* ¶ 16.) After the seizure, Haff talked with Lieutenant Schwandt, who had worked at CCI and knew that CCI had allowed the material. Lieutenant Schwandt told Haff that she would pass along that information to Haferman. (Haff Supp.Aff. ¶ 40.)

As part of his investigation, Haferman reviewed the disruptive group files and reviewed Haff's prison records. Haff had a prior disciplinary action for recruitment that occurred on October 2, 1991. (Haferman Aff. ¶ 9.) Haff had written anti-Semitic letters that referred to Hitler and the Aryan Nation.

---

**2.** Although the defendants did not challenge CJCC's status as a religion in its initial in support of summary judgment, they raised the issue in its response to Haff's motion for summary judg-

ment. Because the court grants summary judgment to the defendants on the RFRA claims, it does not reach that issue.

Haff wrote "I'm sick of this fucking Zion conspiracy," "fucking zionswine ways of life," and "jew boy." Haff gave addresses for receiving Aryan Nation literature. One of the letters was signed with a swastika and an SS symbol. (*Id.* Ex. B.)

Although Haferman took no statements from any inmate and relied on no information provided by other inmates, (Defs.' Answer to Interrog. 5.), he periodically observed Haff meeting with Hutter and Isbel in the library. (Haferman Supp.Aff. ¶ 12.) While Haferman was viewing one of these meetings on December 12, 1993, Haff approached Haferman and asked whether the review of his materials had been completed. Haferman told Haff that the material would not be returned because they were "Aryan Brotherhood." Haff said that the materials were Aryan Nation not Aryan Brotherhood. Haferman said "I don't care, not in this prison!" (Haff.Supp.Aff. ¶ 44(c).) Haff referred Haferman to an Iowa case, *Nichols v. Nix,* 810 F.Supp. 1448 (S.D.Iowa 1993), arguing that the case required the prison to allow Haff to keep the materials. *Id.* Haferman responded, "I don't care what the federal court says, case closed." *Id.* The library meetings continued at least through January 1993. Haff claimed that he and his compatriots were researching how to make a request to have a group recognized.

In January, both Haff and Haferman raised the stakes. Early in the month, Haff met with Chaplain Zoschke who said he would forward the request to start a Christian Identity group (otherwise known as Church of Jesus Christ Christian). (Haff.Supp.Aff. ¶ 30.) Whether or not Zoschke forwarded the request, Warden Cooke says she never received it.

On January 27th, Haferman told Lt. Schwandt to place a "G" on Haff's identification card to show that Haff's gang affiliation. Lt. Schwandt completed the "Disruptive Group Criteria/Validation Worksheet." In that worksheet, she listed Haff's affiliation as Aryan Brotherhood. The rest of the sheet is blank except for one criterion: written docu-

mentation. Under that category, Schwandt wrote that Haff had Aryan Nation documents.

The next day, Haff filed a complaint (KMCI 0152–94) asking for his material back because Haff feared that KMCI would destroy it. Investigator Jaeger handled the complaint. Jaeger had no authority to grant the request; he could only make a recommendation to the warden. (Jaeger Aff.Ex. S.) [3] Haff also gave Jaeger a copy of *Nichols v. Nix.* At the end of the month, Haff sent a letter to Warden Cooke and the Secretary of the Department of Corrections, requesting recognition of his religious group. (Haff. Reply Aff. ¶ 2(a).) Although Warden Cooke said she never received the letter, (Cooke Supp.Aff. ¶ 3), the Secretary of the D.O.C. did.

In February, Haff's fortunes took a turn for the worse. First, Jaeger recommended dismissing complaints KMCI 0152–4 and 00214–94 because the material was Aryan Brotherhood and gang related. (Jaeger Aff. ¶ 6 and Ex. T.). After reviewing the recommendation, Warden Marianne Cooke accepted Jaeger's recommendations and dismissed the complaints on February 14, 1994. (Cooke Aff. ¶¶ 6 and 7.)

Then, on February 28th, as Haff was returning from prison school, a guard searched Haff, finding stationery with an insignia of a shield with a sword topped by a crown. (Haferman Aff.Ex. E.) The letter N and an eagle overlay the sword, and four streaks radiated from the shield. (*Id.* Ex. X, No. 11.) The guard also found a photo of a man looking through the scope of a rifle. (*Id.* Ex. X, No. 7.) Other searches revealed a letter written on the "Church of Jesus Christ Christian" stationary that was addressed to the warden. It said the church would never acquiesce to integrated cells. (*Id.* Ex. M.) Haff also possessed a postcard with an insignia on one side and a call to arms for Aryan Brothers. (*Id.* Exs. N and O.) A document called the "Weltanchauug" (excerpted from Hitler's *Mein Kampf*) described life as an eternal struggle in which Aryans succeeded

3. Later, Haff filed a second complaint (KMCI 00214–94) requesting the same relief. (Jaeger Aff. ¶ 7.)

by trampling over others. (*Id.* ¶ 28, Ex. X.) Haff also had a poem written from the word "nigger." Each stanza began with a different letter of the word. (*Id.* Ex. X.) Haff also had a list with eight names and birth dates; three additional names were scratched out. Haferman thought the list was a membership list. (*Id.* Exs. H and X, No. 24.)

Unhappy with the course of events, Haff contacted an attorney. On March 1, 1994, Haff's attorney discussed the status of the seized materials with Cooke and Jaeger. At 11:35 a.m., Haff learned that his attorney was trying to reach him. Although the prison official agreed to allow a 12:00 phone call, the prison cancelled the call because it would interfere with the meal schedule. (Haff Supp.Aff. ¶ 75.) At 2:45 p.m., on Haferman's recommendation, a prison official placed Haff in temporary lockup (TLU), pending the outcome of the investigation because Haff might intimidate a witness. (Haferman Aff.Ex. G; Defs.' Answer to Interrog. 9.) KMCI officials refused to allow Haff to return his attorney's call until March 3, 1994. (Haff.Supp.Aff. ¶ 75.) On March 30, 1994, Haff filed this action, requesting a preliminary injunction to force KMCI to return the materials (among other things).

While Haff was in TLU, the prison intercepted a letter to Haff from a "Brother Wayne, Director of Prisons." It was on the Church of Jesus Christ Christian stationery. Brother Wayne praised the skinheads and promised payback when he is Director of the Concentration Camps. Wayne also sent a postcard with a swastika on a banner that hangs from a tower and a photo of himself wearing a white power shirt, holding a sword and standing in front of a swastika banner. (Haferman Aff.Ex. Q.) No one ever informed Haff that the prison had confiscated the letter. (Haff's Supp.Aff. ¶ 82(e).) On March 8, 1994, the prison reviewed Haff's TLU placement and continued it.

Haferman completed his investigation and confiscated anything he thought was Aryan Nation white supremacist material, returning all other material to Haff. (Haferman Aff. ¶ 27.) Because of the volume of material,

screening the materials took substantial time. (*Id.*)

On March 15th, Haferman issued conduct report 440219, charging Haff with violating Rule 303.20: Group Resistance and Petitions, and Rule 303.63: Violations of Institution Policies and Procedures.[4] Haferman charged neither Isbel nor Hutter, the two other participants in the meetings, with a disciplinary violation. The conduct report did not list the subsection of Rule 303.20 that Haff violated nor did it explain which institution policy Haff violated. Not until discovery in this case did the defendant reveal that Haff violated the policy forbidding the display of gang insignias. In addition to Haff's library meetings, Haferman relied on the seized items that Haferman concluded were white supremacist and the alleged membership list. Haferman concluded that Haff was promoting white supremacy, which posed a threat to security. (Haferman Aff.Ex. H.)

On March 21st, KMCI extended Haff's stay in TLU after Haff chose a full due process hearing, and the prison was not prepared for a hearing. (Cooke Aff. ¶ 4.) At the hearing, four days later, Lieutenant Harper, the hearing officer, found that Haff violated Rules 303.20 and 303.63, and Haff received four days in adjustment and 180 days in segregation. In justifying the penalty, Harper stated, "Inmate's testimony and the evidence submitted clearly advocate a separation and condemnation of all other races and advocate White Supremacist beliefs." (*Id.* Ex. 4 at 1.)

While in segregation, Haff could not observe the feast of unleavened bread, a major holiday for his religion. (Haff Supp.Aff. ¶ 83.) After the seizure, the plaintiff could not engage in religious education and was denied religious counseling. (*Id.*)

Warden Cooke affirmed the decisions of the hearing officer on Conduct Report # 440219. (Cooke Aff. ¶ 58.) She did not independently review the record. (Defs.' Answer to 2nd Interrog. 10.) After Cooke's ruling, KMCI housed Haff in Step 2 of the KMCI segregation program. The Program

---

4. The regulations are attached as Appendix A.

Review Committee (PRC) took control of his case. Haff asked to be transferred back to CCI.

The D.O.C. transferred Haff to CCI's segregation unit on May 13, 1994. On May 20th, CCI moved Haff to disciplinary segregation II. On June 28, 1994, CCI transferred Haff to the general population. (Rees Aff. ¶ 4.) On July 12, 1994, this court denied the motion for a preliminary injunction. Later, D.O.C. transferred Haff to the Oshkosh Correctional Institution.

On December 8, 1994, the defendants moved for summary judgment, filing a 116–page brief. The court denied the defendants' motion for leave to exceed the 30–page limit. On December 20, 1994, the defendants filed an amended brief of 80 pages, with 45 pages of argument (150% of the limit). Although the court initially denied the defendants' second motion to exceed the page limits, it reconsidered. In May 1995, the plaintiff filed a cross motion for summary judgment.

After numerous extensions and discovery disputes and a day-long hearing (in which the plaintiff argued for over five hours), the court decides the summary judgment motions.

## ANALYSIS

Both sides move for summary judgment. The court may grant summary judgment only if one side deserves judgment as a matter of law based on the undisputed facts. Fed.R.Civ.P. 56(c). Although the court must draw all reasonable inferences in favor of the nonmoving party, *Kincaid v. Vail*, 969 F.2d 594 (7th Cir.1992), the nonmoving party may not rest on the pleadings; rather the party must establish a genuine dispute of fact based upon affidavits and other evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The chart below summarizes the court's conclusions, granting the defendants summary judgment on all claims except the retaliation claim against Haferman.

| Claim | Haferman | Galligan | Jaeger | Cooke |
|---|---|---|---|---|
| No Notice of Undelivered Mail (Due Process) | Not responsible for giving notice | Not responsible for giving notice | Not responsible for giving notice | No involvement |
| Denied Access to Counsel (1st Amendment) | Actions did not deny Haff access | No involvement | No involvement | No involvement |
| Seizure of Materials (1st Amendment and RFRA) | Even if decision to keep materials violates RFRA, Haferman has qualified immunity | No liability. Filling out a report does not implicate Haff's constitutional rights | No liability | No liability |
| Procedural Due Process Violations in the Disciplinary Action | Responsible for notice. Claim is inadequate because no one has invalidated the disciplinary action. | Not the hearing officer: no liability | Not the hearing officer: no liability | Insufficient involvement to be liable |
| Retaliation (1st Amendment and Due Process) | Claim survives Haferman's summary Judgment motion | No allegation of involvement | No allegation of involvement | No allegation of involvement |

## A. Claims against Captain Haferman

The claims against Captain Haferman fall into three categories. First, Haff has RFRA and First Amendment claims for Haferman's decision to confiscate the Aryan Nation material. Second, Haff has procedural due process claims: Haferman ordered a G, which signifies gang membership, placed on Haff's facecard; Haferman recommended putting Haff in Temporary lockup; and Haferman violated procedural due process in the disci-

plinary action. Third, Haff alleges that Haferman retaliated against Haff for Haff's religious beliefs and Haff's decision to contact his lawyer in March 1993.

### 1. Confiscation of Haff's Materials

■ Although the First Amendment determines the legitimacy of Haferman's decision to confiscate Haff's Aryan Nation material, the court must apply two different tests because Congress protects prisoners' freedom of religion rights more than their freedom of speech or association rights. Under RFRA, a prison regulation that substantially burdens the exercise of religion is constitutional only if the regulation is narrowly tailored to serve a compelling government interest. 42 U.S.C. § 2000bb–1. To survive a free speech or free association challenge, however, the prison regulation need only be rationally related to a legitimate penological objective. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987). Nevertheless, Haff's claim fails under both tests.

### a. Free Speech and Free Association Claims

■ Under the *Turner* rule, Haferman could confiscate the material because it could incite hostility towards or violence against black, Hispanic, or Jewish prisoners. Four factors determine whether a prison official's decision was reasonably related to a legitimate penological objective. First, there must be a rational connection between the decision and the legitimate governmental interest. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62. Second, if the prisoner has other alternatives to exercise the right, the decision is more likely to be rational. *Id.* at 90, 107 S.Ct. at 2262. Third, the more problems exercising the right will create for security officers and other prisoners, the more likely the prison can restrict that right. *Id.* Finally, if there are no easy alternatives to the prison official's decisions, the regulation is likely to be rational. *Id.*

■ As important as the substantive factors is the court's method of analysis. Judges must defer to the people who run jails; what seems impractical or paranoid in the safe and contemplative courtroom may be a real and present danger in confines crowded with violent people. *See Keeney v. Heath,* 57 F.3d 579, 581 (7th Cir.1995). As long as the prison official's justification is plausible, the court should accept it. *Id.*

The confiscation of the Aryan Nation documents was more than plausibly related to security concerns because the material promoted racial separation, white superiority, and violence. The documents paint a clear picture: no multi-racial society. Whites are the superior race; blacks, Hispanics, and Jews have mongrelized that race, and integration will destroy the white race. Blacks are subhuman, descended from Neanderthals as opposed to Cro–Magnons. A Jewish conspiracy secretly controls the world and uses the minorities to undermine white culture.

The documents include more than racial and religious hatred; implicitly and explicitly, the documents advocate violence. In the past, whites succeeded by trampling on others. Hitler was right in creating the NAZI regime. (*See* Ex. X generally.) One document declares that "the living Saxon War is upon us." (Ex. X, item 2.) And, a white has a duty to fight a war to purify the chosen race. (Ex. X, Item 4.) Another document declares war on the United States because all peaceful measures have failed. (Ex. X, Item 9.) And, Haferman also found a catalogue for weapons, explosives, and poisons. (*Peace on Earth,* Supp. to Ex. X.) Haferman could reasonably conclude that the material could incite violence.

As to the second criteria, the confiscation allegedly denied him access to all white separatist literature, literature that had religious value to Haff. Even if that were true, Haff still had access to a bible, which allowed him to practice his religion in part. And, the other three factors would justify Haferman's decision.

■ The confiscated material also posed a danger to other inmates and a burden to security officials. Prisoners retain some constitutional protections in prison, *Woods v. O'Leary,* 890 F.2d 883, 884 (7th Cir.1989). So far, the war on crime has not stripped prisoners of all their human dignity. When a

person goes to jail, he is not thrown to the wolves; society, not the prisoners, is supposed to run the penal system. Therefore, every prisoner can expect and demand that the state take reasonable steps to protect his safety. When blacks, Hispanics, or Jews go to prison, they pay their debt to society; they are not condemned to a barbaric land, fearing pogroms by white supremacist inmates.

Prisons are dangerous places, and prison administrators have a difficult task in controlling their populations. Here, Haff's material poses a threat to black, Hispanic, and Jewish prisoners. If whites interpreted the literature as justifying racial violence, it could lead to fights and harassment. In turn, keeping the peace becomes more difficult for prison guards. Under the *Turner* test, the court accepts the prison administrators' justifications as long as they are reasonable. When prison officials try to protect inmates from racial hatred and violence, the court should approve because they are treating their prisoners as people.

Finally, no easy alternatives exist for the prison. Haferman (and now the court) reviewed all of the seized documents. He confiscated many but returned others. Unlike other cases, Haff has not alleged a complete ban, and his two cell mates, also CJCC members, were not harassed. *See e.g., Kikumura v. Turner,* 28 F.3d 592 (7th Cir.) *cert. denied* —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1994) (striking down a prison ban on all correspondence in Japanese). The question is not whether Haferman legitimately confiscated all CJCC material; the question is whether Haferman legitimately confiscated Haff's material—CJCC or not. Haferman knew that Haff was disciplined for recruitment in a prior prison; he also knew that inmates had alleged Haff was recruiting. He could reasonably conclude other white inmates would see the documents. Some might believe the racial war view and decide to begin the fight in prison. His judgment is reasonable.

Because Haff had so much material, Haferman did not have to redact it or separate it out. For example, one issue of *The Way,* a CJCC publication, has a long article on the Septuagint and Maseretic bibles. Although the article is harmless, another page in the same issue describes a 500–year–old Jewish-conspiracy to dominate Christians. Certainly, Haferman could confiscate the latter because someone believing himself the victim of a 500–year–old, Jewish conspiracy may attack a Jewish prisoner. When faced with so much objectionable material, Haferman need not separate the allowable from the objectionable. Moreover, the plaintiff has constantly argued all the documents were protected, and at this late stage the court will not make arguments for the litigants. *Gold v. Wolpert,* 876 F.2d 1327, 1333 (7th Cir. 1989).

#### b. RFRA Claim·

■ Originally, Haff sued for both damages and declaratory relief. Since then, however, D.O.C. has transferred Haff to a different prison. None of the defendants have control over Haff; they have no power to seize his material or to return it. Moreover, Haff's attorney gave Haff a copy of everything Haferman confiscated. Therefore, injunctive relief is moot. Of course, Haff still has a claim for damages.

Under RFRA, if a facially neutral law substantially burdens a person's exercise of religion, the law must be the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb–1(b). Even though Haff can show that confiscating his materials substantially burdened his ability to practice his religion, Haferman satisfied RFRA's requirements because Haferman could not give special protection to religious material without violating the First Amendment. And, even if Haff could show a violation of RFRA, Haferman would have qualified immunity. Therefore, the court does not need to address the defendants' argument that RFRA is unconstitutional.

##### i. The Confiscation Substantially Burdened Free Exercise Rights

■ Courts have taken two approaches to interpreting substantial burden. Under one view, government substantially burdens a religion when it prohibits a mandatory, but not

an optional, religious practice (the mandatory test). *Bryant v. Gomez*, 46 F.3d 948 (9th Cir.1995). Under the second view, prohibiting a religious practice is a substantial burden if the plaintiff's beliefs are sincerely held (the religiously motivated test). *Sasnett v. Sullivan*, 908 F.Supp. 1429, 1444 (W.D.Wis. 1995).[5] Because courts become the arbiters of religion under the mandatory test, this court applies the religiously motivated test.

Whether a practice is mandatory is in the eye of the beholder, leading to fine distinctions between mandatory and unique. For example, in the Ninth Circuit, although Pentecostals have unique practices such as speaking in tongues, a plaintiff must prove that those practices are mandated by the religion; otherwise, a prison may forbid services with those practices without substantially burdening the exercise of religion. *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995); *see also Crosley–El v. Berge*, 896 F.Supp. 885 (E.D.Wis.1995) (plaintiff failed to identify mandatory practices of the Moorish religion). This approach can make the courts arbiters of religious beliefs. One court suggested that it could rely on an orthodox rabbi's opinion that the prisoner was not a sincere Jew based on the prisoner's blood line. *Best v. Kelly*, 879 F.Supp. 305, 309 n. 1 (W.D.N.Y.1995).

Following the Supreme Court's warning, other courts avoid arbitrating what practices are required by a religion. *See Employment Division v. Smith*, 494 U.S. 872, 887, 110 S.Ct. 1595, 1604, 108 L.Ed.2d 876 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"). Instead, these courts determine whether the belief is sincerely held and whether the prohibition substantially

burdens practicing the religion (regardless of whether the practice is a substantial part of the religion) *Muslim v. Frame*, 897 F.Supp. 215 (E.D.Pa.1995). In support of the religiously motivated test, both the *Sasnett* and *Muslim* courts relied on their thorough research and persuasive analysis of the legislative history and the pre-RFRA cases. *See Sasnett*, 908 F.Supp. at 1441–44 and *Muslim*, 897 F.Supp. at 219–20.[6]

■ Because the mandatory test is fraught with practical and constitutional problems, this court applies the religiously motivated test. No religion is so homogenous that the line between a mandatory and an optional practice is clear. The court is in no position to determine whether reading *The Way* is mandatory for Haff's religion. Although the prison provided a Protestant chaplain and Protestant services, CJCC has many unique views justifying white supremacy and white separatist views. When Haferman confiscated the documents, he denied Haff access to religious material that expounded those tenets. Viewing the disputed facts in Haff's favor, his beliefs are sincere. He possessed a plethora of CJCC material and, in his moving papers, explained the religion's dogma in detail. When Haferman confiscated the documents, he denied Haff access to that religious material. The court cannot grant summary judgment for Haferman on the lack of a substantial burden.

### ii. No Violation of RFRA

■ Haferman must prove that the confiscation served a compelling interest and was the least restrictive means to achieve that objective. On its face, RFRA's compelling interest test appears more stringent than the *Turner* test, which requires that the prison's action be reasonably related to a legitimate penological interest. Of course,

---

**5.** *Sasnett* phrases the test in two parts. The plaintiff must show that the burdened practice is "(1) motivated by a sincerely held religious belief and (2) significantly or meaningfully curtailed." *Id.* When, as in this case, possessing and studying *The Way* was prohibited entirely, the second prong is met.

**6.** It may be that *Bryant* and *Crosley–El* stand for the unremarkable principle that the plaintiffs failed to use the word "mandatory." The prob-

lem arises when the plaintiff states that the prohibited practice is mandatory. If the court must accept the plaintiff's statement (unless the plaintiff is insincere), these cases are arguably using the same substantive standard as *Muslim* and *Sasnett*. If, under the *Bryant* standard, the court may reject a plaintiff's sincere belief that the practice was mandatory, the mandatory test embroils courts in religious doctrine.

RFRA is subordinate to the Establishment Clause and Free Speech Clause of the First Amendment. 42 U.S.C. § 2000bb–4. RFRA cannot provide special protection to material because of its religious content; to do so would violate the Establishment Clause and discriminate based on the content of the material (violating the Free Speech Clause). In other words, if the government substantially burdens the practice of religion when it obeys the Establishment or Free Speech Clause, that mandate is a compelling interest, and the burden is the least restrictive means of meeting that interest. *See Rosenberger v. Rector & Visitors of Univ. of Vir.*, —— U.S. ——, ——, 115 S.Ct. 2510, 2522, 132 L.Ed.2d 700 (1995); *see also Flores v. City of Boerne*, 73 F.3d 1352, 1364 (5th Cir.1996). If Haferman had returned the material solely because CJCC is a religion, Haferman would have been favoring religious expression over secular expression in violation of the First Amendment.

■■■■ The Establishment Clause guarantees that government will remain neutral in religious affairs. *Rosenberger*, —— U.S. at ——, 115 S.Ct. at 2521. The government may neither favor nor punish those who practice a religion. *Wallace v. Jaffree*, 472 U.S. 38, 53 n. 37, 105 S.Ct. 2479, 2488 n. 37, 86 L.Ed.2d 29 (1985) (*quoting Everson v. Board of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947)). Although the government must grant religious organizations access to public forums, *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), it may not allow religious displays in nonpublic forums. *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In *Allegheny*, the county allowed a creche in the Grand Staircase of the county courthouse. *Id.* at 600 n. 50, 109 S.Ct. at 3104 n. 50. Because the Grand Staircase was prominent and not generally available for public displays, allowing the creche was an endorsement of Christianity. *Id.* Texas violated the Establishment Clause when it exempted only religious periodicals from its sales tax; the exemption made it easier to promulgate religious beliefs than secular ideas. *Texas Monthly v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1988) (plurality opinion). The exemption gave a benefit to religious publications. *Id.* at 15, 109 S.Ct. at 899–900 (plurality opinion) and 28 (Blackmun J., concurring).

If this court applied a RFRA test more stringent than the *Turner* test, this court would force prisons to favor prisoners' religious material over their secular material because prisons would need a better justification to confiscate religious material than political material. Haferman's decision has survived the *Turner* test—the confiscation was rationally related to a legitimate penological objective. If Haff was not a member of the CJCC, the confiscation would have been unquestionably legal; if RFRA forbids the confiscation, Haff would possess the white supremacist material solely because of its relation to exercising his religious, as opposed to his political, rights. The government would be granting a forum to religious expression that it denies to secular views. Much more than the staircase of a courthouse, a prison is a nonpublic forum whose access is controlled by government officials; therefore, that access must be neutral towards religion and secular ideas. Worse than *Bullock*, where Texas reduced the cost of promulgating religious ideas, prisons would be allowing possession and, thereby, promulgation of religious ideas when it was preventing promulgation of similar secular ideas.

The Establishment Clause is the compelling interest that requires Haferman to treat religious documents the same as secular documents. Although the state of Wisconsin could require greater justification to confiscate secular material, that fact is irrelevant because Congress cannot require states to protect religious expression more than secular expression. Simply, whether Haferman could confiscate Haff's white supremacist literature does not depend on whether Haff is a member of the CJCC, making the literature religious, or whether Haff is a member of the Ku Klux Klan, making the literature political. Such Byzantine hairsplitting has no place in

constitutional analysis.[7]

Moreover, if prison officials used different standards when confiscating religious, white supremacist material than when confiscating political, white supremacist material, the officials would violate the Free Speech Clause as well. In a nonpublic forum, the state may discriminate based on the viewpoint or identity of the speaker only if the control is reasonable in light of the purpose of the forum and is viewpoint neutral. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391–94, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993). A school district discriminated based on viewpoint when it would allow nonreligious presentations on childrearing—but not religious presentations on the same topic. *Id.* The prison would be discriminating based on viewpoint if it allowed material that advocated white supremacy from a religious viewpoint but banned material that advocated white supremacy from a political viewpoint. The Establishment Clause and the Free Speech Clause required Haferman to treat religious material no worse and no better than secular material. As long as Haferman's confiscation passes the *Turner* test, it must also, in this case, pass RFRA's requirements.

### iii. Haferman Has Qualified Immunity

Even if this court is wrong and it can apply a stricter test to a confiscation that burdens the exercise of religion as opposed to the exercise of secular activities, Haff loses on qualified immunity. Qualified immunity shields government officials from liability unless their action violates a clearly established right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). The RFRA standards are not clearly established because the RFRA test is ambiguous, with both Congress and the courts sending mixed

messages. To begin with, the conflict between the mandatory and religiously motivated test creates a hodgepodge of results. For example, wearing a yarmulke outside of a cell does not substantially burden religion in the Western District of New York, but it does in Arizona. *Compare Best*, 879 F.Supp. at 309 (relying on pre-RFRA law in a RFRA case) *with Luckette v. Lewis*, 883 F.Supp. 471 (D.Ariz.1995).

Similar problems exist with the compelling interest test. On the one hand, Congress passes a statute that overrules *Smith* and *O'Leary* and re-establishes the strict scrutiny test. Well-defined in other areas of constitutional law, the strict scrutiny (the compelling interest test) triggers the rare exception when courts will not defer to state officials. On the other hand, Congress also expected courts to give prison officials the same deference as always. *See* S.Rep. No. 111, 103d Cong., 1st Sess. (1993) at 10, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900. Although the statute does not say the compelling interest test has a different meaning in the prison than other contexts, courts have often applied a weaker test, following the legislative history. *Sasnett*, 908 F.Supp. at 1446. As a result, what is a substantial burden, what is a compelling interest, and what is the least restrictive means. At this point, all an official can know is that conduct clearly established as unconstitutional under the pre-RFRA test is also a clearly established violation of RFRA. *Ganther v. Ingle*, 75 F.3d 207, 211 (5th Cir.1996). For all other cases, until either the Seventh Circuit or the Supreme Court defines what conduct violates RFRA's compelling interest test, prison officials must have qualified immunity.

Applying the compelling interest (or strict scrutiny) test in the context of prisons should transform the law and significantly restrict

---

7. In its most recent Establishment cases, the Supreme Court has analyzed the issues without the aid of the *Lemon* test. *See Rosenberger*, — U.S. at ——, 115 S.Ct. at 2520–25 and *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, — U.S. ——, ———–——, 114 S.Ct. 2481, 2487–91, 129 L.Ed.2d 546 (1994). The Court, however, did not explicitly overrule the test. Under that test, an establishment violation occurs unless the law has a secular purpose, the law's

primary effect neither advances nor inhibits religion, and the law does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1970). Applying a RFRA standard different from *Turner* would violate the second prong. And, if RFRA requires courts to distinguish between mandatory and optional religious practices, it might cause excessive governmental entanglement with religion.

prison official's discretion. Even if being in prison creates circumstances that make restrictions more justifiable, the compelling interest test also affects the way the court analyzes the issues. Strict scrutiny is the greatest burden the courts can place on government officials. Courts reserve it for those cases involving severe political bias like laws that discriminate based on race. When the court applies strict scrutiny, it must make its own factual determinations; it may not defer to the state actors. To do so would undermine the whole purpose of the compelling interest standard. In *Sherbert v. Verner*, South Carolina denied unemployment compensation to Seventh Day Adventists because they refused to work on Saturdays. 374 U.S. 398, 407, 83 S.Ct. 1790, 1795–96, 10 L.Ed.2d 965 (1963). In defense of its position, South Carolina argued that if it made an exception for Seventh Day adventists, too many people would fraudulently claim to be Seventh Day adventists, seek benefits, but refuse to take a job that required working on Saturday. *Id.* at 406–07, 83 S.Ct. at 1795–96. The possibility of such a danger was insufficient to establish a compelling interest because the state had no evidence to support its assertion, evidence that would have allowed the court to determine whether the danger was real or imaginary. *Id.*

A compelling interest is a specific, provable danger—not a real but vague concern. For example, generalized security fears are not a compelling interest, and they will not justify racially segregated cells. *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir.1981) *citing Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (*per curiam*). Rather the prison may segregate when the particularized circumstances show actual racial tension; for example, a white inmate with a history of racial violence may be housed only with other white prisoners. *Lee*, 390 U.S. at 334, 88 S.Ct. at 994–95 (concurring opinion). In *Sockwell v. Phelps*, a Louisiana prison segregated two-man cells because guards could not monitor the cells all the time, the prisoners in that cell block were the most dangerous ones in the prison, twice violence broke out in integrated two-man cells, racial supremacy groups existed in the prison, and interracial conflicts might trigger more racial violence. 20 F.3d 187, 191 (5th Cir.1994). Although the prison could segregate those who had engaged in racial violence, the prison's justification were generalized fears, insufficient to support segregation of all two-man cells. *Id.*

For a government action to withstand the compelling interest test, the action must also be the least restrictive means to achieve that compelling interest. In other words, the court decides which means are the best, and the state must follow that decision. Run-of-the-mill administrative costs and inconveniences do not justify rejecting an accommodation under the least restrictive test. *Campos v. Coughlin*, 854 F.Supp. 194, 208 (S.D.N.Y.1994).

Under RFRA, however, most courts have applied a weaker compelling interest test, continuing to show prison officials deference. Sometimes, deference appears in the compelling interest prong with courts' accepting generalized fears instead of requiring specific factually-proven dangers. In *George v. Sullivan*, the prison officials confiscated a CJCC pamphlet because it fostered racial animosity. 896 F.Supp. 895, 896 (W.D.Wis.1995). Animosity was conducive to violence and threatened prison security, especially because of gang activity. Prison security was a compelling interest justifying confiscating the material. *Id.* at 898. There was, however, no history of racial violence involving the prisoner nor was there evidence that the material (or material similar to it) had fostered violence. Although the defendants' concerns were no doubt real, the *Sockwell* court rejected the same generalized fears— violent inmates and racial gangs—as justification for segregation of prison cells.

Other times, deference appears in the least restrictive element. In a confiscation case, the defendants argued that redacting racial hatred and violence language from the seized magazines was impossible. *Reimann v. Murphy*, 897 F.Supp. 398, 402 (E.D.Wis. 1995). And, the court agreed that redaction was impossible and held the decision was the least restrictive way to protect prison security. *Id.* Under the least restrictive prong, however, the state must show that every

other alternative is also impossible. For example, the prison could have allowed the inmate to view the material only in the library, only during certain times, and only in the presence of a guard.[8]

RFRA creates a quandary for the courts: either courts undermine prison administrators, or they undermine the compelling interest test. Common sense dictates the results in *George* and *Reimann;* prison officials understand far better than courts the dangers of gangs parading as religions in prisons. *George,* 896 F.Supp. at 897. Congress may rightly worry that many religious groups, being discrete, insular, and easily identifiable, need the protection of the courts; however, religion raises complicated issues involving prison security. Unlike racial segregation, which arises only in a limited area (segregation of cells, prisons, lunch rooms, etc.), the exercise of religion can affect all areas of prison life. Religious correspondence and group worship can pose a threat to security; group identification can create hostility with nonbelievers and lead to violence. These are delicate balances for which prison administrators have a better feel. When the policy is facially neutral, the threat of religious harassment is significantly less. In those circumstances, the courts should pay deference to the prison administrators. Too strict of a test will upset that balance.

Unlike the Establishment Clause, however, general security fears, although important, are not a constitutional mandate or a compelling interest. If the courts interpret RFRA to apply a weaker compelling interest test, they risk the compelling interest test becoming a platitude. Courts have limited resources, which they jealously guard. The compelling interest test signals those circum-

stances in which the court must expend its full energy to insure constitutional justice. As some courts weaken the RFRA test, other courts may import the RFRA test in areas where the traditional compelling interest test is needed. Then, laws deserving the strictest scrutiny will receive a more lenient review. *Cf. Smith,* 494 U.S. at 888, 110 S.Ct. at 1605 ("watering [the compelling interest test] down here [in the context of free exercise of religion] would subvert its rigor in the other fields where it is applied.")[9] Weakening that test could deny the courts and society the power to correct severe injustices.

Neither alternative is appealing. Fortunately, this court need not resolve those tensions. If neither Congress nor the courts interpret RFRA's requirements consistently, courts cannot expect state officials to understand the laws better than the supposed experts. Haferman would lose his qualified immunity only if the confiscation violated the pre-RFRA standards. Because the pre-RFRA religious freedom test is the same as the current freedom of speech test and because Haferman's actions passed that test, he did not violate pre-RFRA test. Therefore, he has qualified immunity.

Haff believes an Iowa district court case clearly established the constitutional standards under the pre-RFRA standards. In *Nichols v. Nix,* 810 F.Supp. 1448 (S.D.Iowa 1993), a prison's blanket ban on all CJCC materials violated the Constitution. Without a better discussion of what was seized, this court cannot determine whether *Nix* is analogous to this case; however, unlike *Nix,* the confiscation in Haff's case related to one prisoner with a history of recruitment. Even if *Nix* is indistinguishable, *Nix* has no impact on Haferman's qualified immunity. District courts decide cases; they do not make bind-

---

8. In Haff's case, it would be difficult for the defendants to justify the confiscation under the least restrictive prong. On the one hand, Haferman confiscated Aryan supremacy documents that advocate violence, including an excerpt of *Mein Kampf.* On the other hand, *Mein Kampf* itself is available in the prison library. *See* Ex. X. Unless the defendants could explain why the Aryan Nation material was more likely to incite violence than *Mein Kampf,* the least restrictive alternative would be to store Haff's Aryan Nation material in the library.

9. Cross-pollinization between Equal Protection analysis and First Amendment analysis occurs. In determining whether a law's object is neutral under the Free Exercise clause, courts rely on principles from Equal Protection analysis. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 538–40, 113 S.Ct. 2217, 2230, 124 L.Ed.2d 472 (1993) (Kennedy J.).

ing precedent. A district court decision, alone, can never establish a constitutional standard, even if the appellate court affirms the decision in an unpublished order. *Anderson v. Romero,* 72 F.3d 518, 525 (7th Cir.1995). Because *Nix* is a district court decision affirmed by an unpublished order of the Eighth Circuit, it is irrelevant to a qualified immunity decision in Wisconsin. Because Haferman has qualified immunity, the court grants summary judgment on the RFRA claim for confiscating Haff's material.

### 2. Procedural Due Process Claims

A procedural due process violation occurs only when the defendant deprives the plaintiff of a liberty interest and the deprivation occurs without the constitutionally required procedures. *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). Additionally, If the prisoner claims an unconstitutional procedure caused him to lose good time, the prisoner must show that either the state or federal court in a habeas corpus action has invalidated the sentence. *Miller v. Indiana Dep't of Corrections,* 75 F.3d 330, 331 (7th Cir.1996).

A prisoner has a liberty interest in avoiding prison discipline only if the discipline differs dramatically from the treatment of prisoners generally. *Sandin v. Conner,* — U.S. —, —, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1994). A disciplinary violation in prison that could later affect a parole decision did not implicate a liberty interest because a prisoner's disciplinary record was only one of many criteria used to determine parole. *Id.* at —, 115 S.Ct. at 2301. Being placed in a temporary lockup does not trigger due process protections. *Russ v. Young,* 895 F.2d 1149, 1154 (7th Cir.1989). Neither Haff's placement in TLU nor the "G" on his facecard triggers procedural due process protections. Like a disciplinary violation, the "G" on his facecard could result in more severe punishment in the future, but it is only one of many factors. Only Haff's loss of good time required procedural due process.

Because neither the state of Wisconsin nor a federal court in a habeas action has invalidated the disciplinary decision, however, this court, after *Miller,* must grant sum-

mary judgment to the defendants on Haff's procedural due process claims. *Miller* prevents prisoners from ignoring the state-created review process. Because *Miller* was decided after briefing was completed, the court would usually give Haff a chance to allege and prove facts sufficient to overcome the new requirement; however, there is no need to do so. If the state had reversed the disciplinary decision, Haff or the defendants would have told the court. A reversal would have preclusive effects on this court's findings. Also, the restoration of Haff's good time would have been relevant to whether Haff could obtain damages for the procedural violations. Because a reversal of the disciplinary action, had it occurred, should have been in the summary judgment record and because it is not, the court concludes that Haff's disciplinary action has not been invalidated. Therefore, *Miller* bars Haff's procedural due process claims.

### 3. The Retaliation Claim

Retaliation occurs when a prison official punishes a prisoner because the prisoner has exercised a constitutional right. *Cale v. Johnson,* 861 F.2d 943, 951 (6th Cir. 1988). Procedural protections will not save a disciplinary action that infringes on the prisoner's constitutional rights. *Black v. Lane,* 22 F.3d 1395, 1403 (7th Cir.1994). Even if the disciplinary action could have been taken for an alternative reason, a retaliation claim can still exist. *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987).

To show a retaliation claim, the plaintiff must allege and prove a chronology of facts from which retaliation can be inferred. *Cain v. Lane,* 857 F.2d 1139, 1143 n. 6 (7th Cir.1988). In addition, the plaintiff must show that the retaliatory motive was a substantial cause of the defendant's actions. Then, the defendant may argue that the disciplinary action would have happened regardless of the defendant's motives. *Mt. Healthy City School District Board of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976). In other words, the defendant must prove the disciplinary action *would* have occurred regardless of the defendant's motives,

not just that the disciplinary action *could* have occurred regardless of the defendant's motives.

■■■ Haff has sufficient evidence to support two theories of retaliation: Under the first theory, Haferman retaliated against Haff for his beliefs. Once Haferman saw the seized documents, he decided to punish Haff. Haferman spent three months collecting evidence, seizing documents, and observing the library meetings. He had all of the evidence by the end of January 1994, but he continued the investigation for two more months. In January, he ordered Schwandt to complete a "Disruptive Group Criteria/Validation Worksheet" and put a "G" on Haff's facecard to signify gang membership. Schwandt identified the gang as Aryan Brotherhood and not Aryan Nation. A jury could infer that Haferman told Schwandt that Haff's affiliation was Aryan Brotherhood because it has a worse reputation than the Aryan Nation. Then, in March, Haferman recommended placing Haff in TLU because Haff might intimidate a witness, even though Haferman had not taken any statements from witnesses and would not take any witness statements. Finally, Haferman included the violation of prison policy in his conduct report, but he never identified which policy, and the fact section of the conduct report is silent on the issue as well.[10]

Certainly, there are many explanations for Haferman's conduct, and most of them do not support a retaliation claim. Nonetheless, the length of the investigation, the mistake on the Disruptive Group Worksheet, the circumstances surrounding the temporary lockup, and the lack of notice create the factual basis for a retaliation claim. Because Haff raises a retaliation claim, it does not matter that the individual harms (being placed in TLU or having a "G" on his facecard) are not constitutional violations.

Under Haff's second theory, Haferman retaliated against Haff because Haff contacted a lawyer about the seized documents. Between the initial incident and early March,

Haferman took no action against Haff except for having the "G" placed on the facecard. Then, on March 1, 1994, Haff's attorney discussed the seized materials with Warden Cooke and Jaeger, the guard who investigated Haff's complaint. At this time, Haff was contemplating suing the prison to obtain his materials, and Haff's attorney tried to contact Haff. A jury could infer that Haferman learned about the imminent court action from either Warden Cooke or Jaeger (who investigated Haff's inmate complaints). Three hours after Haff's attorney tried to contact Haff, Haferman recommended placing Haff in TLU even though Haff had been in the general population for three months without Haferman believing a threat of intimidation existed. Then, within a week, on March 8, 1995, Haferman issued a conduct report based on evidence he had since January. Once again, the timing may be coincidental, but when taken with the notice problem, one can infer retaliation.

Because Haferman has not yet raised his affirmative defense, the court must deny the state's summary judgment motion on plaintiff's retaliation claim. At the same time, the Attorney General, who represents all the defendants, has had to respond to too many legal theories. The plaintiff's theories are like locusts: they appear briefly; they disappear; they reappear. Therefore, the court grants leave to Haferman to file a new summary judgment motion and supporting documents within 30 days of the date of this order.

**B. Officer Galligan**

■■■ The plaintiff has no case against Officer Galligan. Officer Galligan reported the prisoner's allegations about Haff's recruitment. At best, Galligan failed to include the names of prisoners and confused the Aryan Nation with the Aryan Brotherhood, but none of that violates Haff's constitutional rights. What others did with the report is a different matter, one that does not implicate Galligan. If the report did not justify the

---

**10.** In his moving papers, Haff also says Haferman ordered unnecessary urine tests. Because Haff did not submit those facts as part of his proposed findings of fact, they are not part of the summary judgment motion. Local Rule 6.05(a) (E.D.Wis.). The court will not dig through a party's affidavits to find factual support for his arguments.

search, Haff must sue the person who ordered the search.

Although Haff asserts that the Constitution required Galligan to list the names of each witness, Haff has given the court no legal authority that Galligan had to list every witness because no authority exists. Raising that obligation (which does not exist under state law either) to a constitutional responsibility only demeans the rights the Constitution does protect.

The court grants summary judgment for all claims against Officer Galligan.

### C. Claims Against Warden Cooke

■ As far as the court can determine, Haff alleges that Cooke did not independently investigate allegations against Haff or independently review Haferman's confiscation decision. In addition to Haff's failure to explain Cooke's constitutional obligation, Haff can show no harm from Cooke's actions. The court dismisses the claims against Warden Cooke. Whether or not Cooke independently reviewed the disciplinary decision, *Miller* bars his claim.

As to her decision to deny Haff's inmate complaint, Haff has never explained what harm Cooke's actions caused. Haferman was also reviewing the material and found much of it to be contraband. If Haferman's seizing and reviewing is constitutional or deserves qualified immunity, then Cooke's mistakes (if any) are irrelevant. Moreover, Haff's inmate complaint accomplished its goal: forestalling destruction of the documents. The court grants summary judgment for Warden Cooke.

### D. Officer Jaeger

■ Officer Jaeger did not violate Haff's constitutional rights either. Jaeger played a small role in this long case. When Haff feared that the prison would destroy his documents, he filed a complaint, asking for the documents back. Jaeger reviewed the complaint and recommended dismissing it. Jaeger did not have the authority to grant or deny the request. Like Galligan, he is not a proper defendant.

### E. The Lost Mail

Haff alleges that prison officials never informed him that the prison had prevented delivery of a letter to him. Because Haff never specifies who was responsible for informing him, the court dismisses the claim.

### F. Access to Attorney

■ Although the plaintiff has alleged a denial of access to his attorney, he has, despite the mountains of submissions, never developed the argument. He has never given the legal standards; he has never told the court his factual theory. As the court understands Haff's position, the prison on one occasion prevented Haff from contacting his attorney for two days. At the time, Haff was in temporary lockup. Haff has not explained the prejudice to his case. *See Bruscino v. Carlson*, 854 F.2d 162, 167 (7th Cir.1988). A two-day delay in contacting an attorney is not a constitutional violation except in extraordinary circumstances. The court dismisses the access-to-the-court claim.

### CONCLUSION

The court accepts the plaintiff's sur-reply brief.

The court denies the plaintiff's motion for summary judgment.

The court grants summary judgment for Marianne A. Cooke, Scott Galligan, and Jeff Jaeger, and the court dismisses Cooke, Galligan, and Jaeger from the case.

The court grants summary judgment to Captain S. Haferman on all claims except for the retaliation claim.

*Captain Haferman shall have 30 days from the date of this order to file a new summary judgment motion on the retaliation issue. He may raise his affirmative defense or challenge the plaintiff's prima facie case. The rest of the briefing shall follow Local Rule 6 (E.D.Wis.). The parties may submit only those additional undisputed facts necessary for this limited issue.*

If Haferman does not file a new summary judgment motion, the deputy clerk will contact the parties to set a new final pretrial date and a new trial date.

Because the court has granted summary judgment on the RFRA claim, there is no need for expert testimony on Identity Christianity. Therefore, the court grants the defendants' motion to strike the testimony of Professor Aho.

**SO ORDERED.**

## APPENDIX A

**DOC 303.20 Group resistance and petitions.** (1) Any inmate who intentionally participates in any group activity which is not approved under s. DOC 309.365 or is contrary to provisions of this chapter, to institution policies and procedures or to a direct verbal order from a staff member, but which does not create a serious risk of injury to persons or property, is guilty of an offense.

(2) Any inmate who intentionally joins in or solicits another to join in any group petition or statement is guilty of an offense, except that the following activities are not prohibited:

(a) Group complaints in the inmate complaint review system;

(b) Group petitions to courts;

(c) Authorized activity by groups approved by the superintendent under s. DOC 309.365 or legitimate activities required to submit a request under s. DOC 309.365(3) or (4); or

(d) Group petitions to people outside an institution, for example, to legislators or newspapers.

(3) Any inmate who intentionally participates in any activity with the purpose of identifying himself or herself with an inmate gang, as defined in s. DOC 303.02(9), is guilty of an offense.

**History:** Cr. Register, August, 1980, No. 296, eff. 9–1–80; emerg. am. eff. 12–5–86; am. Register, June, 1987, No. 378, eff. 7–1–87.

**DOC 303.63 Violations of institution policies and procedures.** (1) Each institution may make specific substantive disciplinary policies and procedures relating to:

(a) Visiting, including no-contact visiting;

(b) Recreation;

(c) Smoking;

(d) Movement within and outside the institution;

(e) Attire;

(f) Personal property;

(g) The use of institution facilities;

(h) Talking;

(i) Sale of craft items;

(j) Authorized enterprises; and

(k) Reporting illness or injury.

(2) Violations of any specific policies or procedures authorized under sub. (1) are offenses.

**History:** Cr. Register, August, 1980, No. 296, eff. 9–1–80; am. (1)(d) and r. (3), Register, April, 1985, No. 352, eff. 5–1–85; am. (1)(a), Register, April, 1994, No. 460, eff. 5–1–94.